[Crim. No. 10522. Fourth Dist., Div. Two. Oct. 3, 1979.]

In re DONALD BRAY on Habeas Corpus.

## COUNSEL

Rowan K. Klein and Patricia E. Nelson for Petitioner.

Quin Denvir, State Public Defender, Jonathan B. Steiner, Michael Tanaka and Richard Lennon, Deputy State Public Defenders, as Amicus Curiae on behalf of Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Steven V. Adler, Deputy Attorneys General, for Respondent.

## OPINION

**MORRIS, J.**—Petitioner Donald Bray pleaded nolo contendere to a charge of passing checks without sufficient funds (Pen. Code, § 476a).[1] At that time, the indeterminate sentencing law (ISL) was in effect. Petitioner was sentenced to a term of six months to fourteen years. (Former §§ 18a, 476a.)

He was first paroled on this charge on May 11, 1976. He thereafter violated parole and was returned to prison. He was in prison custody for parole violation on July 1, 1977, when the Uniform Determinate Sentencing Act 1976 (Stats. 1976, ch. 1139, pp. 5061-5178, as amended by Stats. 1977, ch. 165, p. 639 became operative.

Under the provisions of the determinate sentencing law (DSL), petitioner could be confined for parole violation for a maximum of six months. (Former § 3057; Stats. 1977, ch. 165, § 58, p. 669.) Accordingly, he was again released on parole on January 1, 1978, six months after the operative date of the DSL.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

He absconded from the jurisdiction and was again confined for parole violation on April 30, 1978. He was again paroled on September 1, 1978. Petitioner was scheduled to be discharged on February 21, 1979. The DSL mandated that petitioner could be retained under parole supervision or in custody for a maximum of 18 months. (Former § 3000, subd. (d); Stats. 1977, ch. 165, § 42, p. 664.) His discharge date was fixed in accordance with the provisions of the DSL, taking account of the time that petitioner was a fugitive from justice (§ 3064).

The parole provisions of the DSL were amended by Statutes 1978, chapter 582, page 2002. The parole term (if there is no confinement for parole violation) was increased from one year to three years, and the maximum statutory period of parole (if there is a confinement for parole violation) was increased from eighteen months to four years. (§ 3000; Stats. 1978, ch. 582, § 1, p. 2002.[2] The maximum period of confinement for a parole violation was increased from six months to twelve months. (§ 3057; Stats. 1978, ch. 582, § 4. p. 2004.) These new provisions became effective on January 1, 1979.

The Department of Corrections did not honor the discharge date previously set for petitioner but notified him that he was to be retained on parole for a period of three years from January 1, 1978.

Petitioner contends that, as applied to him, the amended parole provisions are unconstitutional as an ex post facto law. He further argues that Penal Code section 3 requires that the new parole provisions may not be applied retroactively, and also that due process requires that his time in parole custody may not be extended without a hearing. Amicus curiae argues that the retroactive application of the new longer parole terms violates equal protection.

■ Because we hold that, as to petitioner, the amended parole provisions have an ex post facto effect, we need not consider petitioner's remaining contentions.

---

[2] The provision for the maximum statutory period of parole is relevant here since petitioner has twice violated his parole.

■ "A statute has an ex post facto effect when it alters the situation of an accused to his disadvantage by: (a) making criminal an action innocent when done; (b) making more serious an act already criminal when done; (c) inflicting greater punishment than that attending the act at the time it was committed; or (d) permitting a person to be convicted with less evidence than was required when the act was done. (*Kring* v. *Missouri* (1882) 107 U.S. 221 [27 L.Ed. 506, 2 S.Ct. 443].) The doctrine does not apply to trivial matters but to some vested and substantial right possessed at the time of the offense. [Citations.]" (*People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 472 [106 Cal.Rptr. 519, 82 A.L.R.3d 804].)

■ Petitioner argues that, as to him, new section 3000, increasing the length of the parole term, is unconstitutional as an ex post facto law.

The Attorney General argues that, since petitioner was subject, at the time the crime was committed, to a combined prison and parole term of up to 14 years, new section 3000 does not impose a punishment greater than that attending the act at the time it was committed, and that therefore it has no ex post facto effect.

The Attorney General is correct that the four-year maximum parole term under new section 3000 is less than the term to which petitioner was subject at the time the crime was committed. The Attorney General's view, however, overlooks the effect of the DSL, as operative on July 1, 1977.

The DSL as operative on July 1, 1977, restructured the entire sentencing and parole system. The Legislature clearly intended the DSL to apply retroactively. The Legislature expressly made many provisions of the DSL, including the parole provisions, applicable to those prisoners who committed crimes before July 1, 1977. (See, e.g., former § 3000, subd. (b); Stats. 1977, ch. 165, § 42, p. 664.)

The DSL could only have an ameliorative effect as applied to prisoners sentenced under the ISL. (*In re Greenwood* (1978) 87 Cal.App.3d, 777, 784 [151 Cal.Rptr. 223]; *Way* v. *Superior Court* (1977) 74 Cal.App.3d 165, 173 [141 Cal.Rptr. 383].) Thus, no question of an ex post facto violation arose, even though the Legislature expressly made the DSL retroactive. (*People* v. *Superior Court (Gonzales)* (1978) 78 Cal.App.3d 134, 142 [144 Cal.Rptr. 89].) Furthermore, retroactive application of the DSL to prisoners sentenced under the ISL was upheld as against the finality of

judgment rule. (*Way* v. *Superior Court, supra,* 74 Cal.App.3d 165, 179-180.)

The Attorney General argues, nevertheless, that any entitlement to the one-year parole (or the eighteen months maximum parole period) under former section 3000 was not vested. The Attorney General relies on *In re Fain* (1976) 65 Cal.App.3d 376 [135 Cal.Rptr. 543]. Fain had a parole hearing before a panel of the Adult Authority. The Adult Authority granted him parole and set a parole release date which became "final" under former section 5076.1 and the parole board regulations. (*Id.,* at p. 384.) Because of the public outcry over Fain's impending release on parole, the Adult Authority began proceedings to rescind Fain's parole release date. The court held that the Adult Authority could properly take steps to rescind Fain's "final" parole date. "Any deliberative body—administrative, judicial or legislative—has the inherent power to reconsider an action taken by it unless the action is such that it may not be set aside or unless reconsideration is precluded by law. [Citations.]" (*Id.,* at p. 389.)

The present case is distinguishable from *Fain* in two significant respects. First, although Fain argued that his parole release date was "final," the language of the statute and the parole board regulations did not in fact state that the action was final.[3] Thus the Adult Authority was not precluded from reconsidering its decision. On the other hand, former section 3000 precisely set forth that parole was not to exceed one year, or in any event a maximum period of eighteen months. Second, Fain had been set a parole release date, but had not been paroled. In contrast, petitioner has actually been released on parole. Although the Community Release Board (CRB) had discretion under section 1170.2 to reconsider a decision whether to grant parole, it had no power, once petitioner was paroled, to "reconsider" its decision and retain petitioner on parole beyond the 18-month maximum period. The CRB is required to apply the DSL to ISL offenders as prescribed. (*People* v. *Alcala* (1977) 74 Cal.App.3d 425, 427 [141 Cal.Rptr. 442].) Thus petitioner did not have a mere expectancy that he would be discharged after the 18-month period, but rather a vested right under the statute.

█ " 'An *ex post facto* law is one which, operating retrospectively and on penal or criminal matters only, renders a previously innocent act

---

[3]Former section 5076.1 did not provide that the parole action by case-hearing representatives would be final if certain procedures were followed, but rather took the form that an action recommending parole would *not* become final until approved by a panel of members of the Adult Authority.

criminal, aggravates, or increases the punishment for, a crime, alters the rules of evidence, penalizes an innocent act while assuming to regulate civil rights and remedies, *deprives an accused of some protection or defense previously available, or alters his situation to his disadvantage.*' " (*Ellis* v. *Dept. of Motor Vehicles* (1942) 51 Cal.App.2d 753, 758 [125 P.2d 521], second italics added.)

The emphasized portion of the definition[4] delineates a distinct category of ex post facto cases. In *In re Murphy* (C.C.D.Mo. 1867) 17 F.Cas. 1030 (No. 9947), the defendant was charged with destroying Union steamboats during the Civil War. He was tried and convicted in Missouri by a military commission, although the federal courts were open at the time and place (Tennessee) of one of the alleged acts, at the time and place (Louisiana) of his arrest, and at all times in Missouri. Under the terms of a statute in force at the time of the alleged acts, the defendant was required to be discharged because there were no proceedings in the courts of law instituted against him within a specified period of time. A statute passed after defendant had been tried and convicted attempted to ratify and make valid all proceedings done by military commissions under order of the president. The court held that the attempted validation of defendant's conviction was unconstitutional as an ex post facto application of the law. It should be noted that the ex post facto law in question did not make criminal an act which was innocent when done; it did not aggravate or increase the seriousness of an act already criminal when done; it did not make the punishment for a criminal act greater than that attending the act at the time it was committed; nor did it change the rules of evidence to make it easier to secure a conviction. Rather, the law attempted to deprive defendant of a protection to which he had become entitled under the first statute. The acts he committed were at all times subject to criminal sanctions—in fact, the court reserved judgment to determine whether defendant should be remanded for trial in the federal courts of Louisiana or Tennessee—but defendant could not be deprived by the military authorities of trial by jury in the federal courts

[4]A similar definition is set out in *People of United States* v. *McDonnell* (N.D.Ill. 1934) 11 F.Supp. 1014, 1015: " 'A law which deprives an accused person of any substantial right or immunity possessed by him before its passage is ex post facto as to prior offenses.' 12 C.J. p. 1103." See also *In re Nachnaber* (1928) 89 Cal.App. 530, 533 [265 P. 392], in which the court stated that " 'The real question to be framed is whether the person accused has been deprived of a substantial right by reason of the change.' [Citation.] . . ."; and *State* v. *Rowe* (1935) 116 N.J.L. 48 [181 A. 706, 709]: " 'Other classes [of ex post facto laws] sometimes added to the foregoing are: . . . [¶] 6. A law which deprives persons accused of crime of some lawful protection to which they have become entitled, such as the protection of a former conviction or acquittal, or of the proclamation of amnesty. Cooley, Const.L. p. 286. [¶] . . . [It is also] "[e]very law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage." ' "

where the courts were open, nor could he be deprived of his statutory discharge from the jurisdiction of the Missouri federal court.

In *State* v. *Keith* (1869) 63 N.C. 140, the North Carolina Supreme Court had occasion to consider an ordinance which purported to repeal an amnesty act, which had granted a full pardon for all homicides and felonies committed by Union or Confederate soldiers in the discharge of their duty. The amnesty act pardoned conduct which would otherwise have been criminal. The court held that the ordinance repealing the amnesty act was invalid as an ex post facto law. "The ordinance in question was substantially an *ex post facto* law; it made criminal what before the ratification of the ordinance was not so; and it took away from the prisoner his vested right to immunity." (*Id.,* at p. 145.) The ex post facto law did not change the law in effect at the time the acts were committed; rather, it reinstated the law in effect at that time. Nevertheless, the ordinance was declared invalid because it deprived the prisoner of an immunity to which he had become entitled by statute. The amnesty act placed Civil War soldiers in the position as if the acts they committed were not criminal. The soldiers could not constitutionally be deprived of that benefit.

Similarly in the instant case, it is evident that, in respect of the retroactive portions of the DSL, its effect was to place ISL prisoners such as petitioner in a position as if the DSL were the law at the time they committed their offenses.

The Legislature expressly stated that the DSL was retroactive. Petitioner and many other ISL prisoners received the benefits expressly provided for in the DSL. Although a redetermination of an ISL offender's term under the DSL is not a resentencing (*In re Greenwood,* *supra,* 87 Cal.App.3d 777, 783; *In re Gray* (1978) 85 Cal.App.3d 255, 262 [149 Cal.Rptr. 416]), the CRB must apply the DSL, as prescribed, to prisoners who committed crimes before July 1, 1977 (*People* v. *Alcala,* *supra,* 74 Cal.App.3d 425, 427).

"Ex post facto laws are prohibited by both the federal and state Constitutions. (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9.) It is settled that among such laws are those which retroactively modify the time of discharge from custody to the substantial detriment of the defendant, thereby in effect increasing the punishment previously imposed for his crime. [Citations.]" (*In re Dewing* (1977) 19 Cal.3d 54, 57 [136 Cal.Rptr. 708, 560 P.2d 375].) New section 3000 seeks to retroactively

modify the time of petitioner's discharge from custody to his substantial detriment. As applied to him the new provisions extending the length of the parole period are invalid as an ex post facto law.

Against this conclusion, the Attorney General sets three cases: *Dobbert* v. *Florida* (1977) 432 U.S. 282 [53 L.Ed.2d 344, 97 S.Ct. 2290], *People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465], and *Greenholtz* v. *Nebraska Penal Inmates* (1979) 442 U.S. 1 [60 L.Ed.2d 668, 99 S.Ct. 2100]. In *Dobbert,* defendant had committed certain murders in 1971 and 1972, when Florida had a death penalty statute. The United States Supreme Court later ruled a Georgia death penalty statute unconstitutional (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]). Afterwards, the Florida Supreme Court determined that the Florida death penalty statute was inconsistent with *Furman.* Late in 1972, Florida enacted a new death penalty procedure. The defendant's trial was conducted under the new statute. He was found guilty of first degree murder and sentenced to death. The defendant argued that he could not be punished under the new death penalty law because there was no death penalty law "in effect" at the time he committed the offense; i.e., there was no valid death penalty in effect at that time. The United States Supreme Court rejected this argument, pointing out that, even if a statute is later declared unconstitutional, " '. . . The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored.' [¶] Here the existence of the statute served as an 'operative fact' to warn the [defendant] of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution." (*Dobbert* v. *Florida, supra,* 432 U.S. 282, 297-298 [53 L.Ed.2d 344, 359, 97 S.Ct. 2290, 2300].)

*Dobbert* is clearly distinguishable from the case at hand. The defendant was neither tried nor sentenced under the old death penalty law. The only effect of the statute on him was to provide a sufficient warning of the seriousness which Florida ascribed to first degree murder. Defendants in his position were not expressly granted the benefit of some lesser penalty.[5] In the instant case, petitioner was tried and sentenced under the ISL. His judgment of conviction was final. The Legislature expressly

---

[5]Interestingly, Florida prisoners who had been tried and sentenced under the unconstitutional death penalty statute were all resentenced to life imprisonment. (*Dobbert* v. *Florida, supra,* 432 U.S. 282, 301 [53 L.Ed.2d 344, 361, 97 S.Ct. 2290, 2302].) The Attorney General has not argued that in that case Florida could have resentenced these prisoners to death.

granted to prisoners in his position the benefits of the DSL, which benefits are now sought to be taken away.

Moreover, even upon the question of law involved in *Dobbert*, the result in California may differ. Two California cases held that a reinstated death penalty law could not constitutionally apply to cases arising before the effective date of the new law. "Although the electors at the November 7, 1972, General Election adopted Proposition 17 which added section 27 to article I of the Constitution purporting to nullify *Anderson's* holding of the invalidity of the death penalty, the constitutional prohibitions against ex post facto laws (U.S. Const., art. I, § 10; *Kring* v. *Missouri* (1882) 107 U.S. 221 [27 L.Ed. 506, 2 S.Ct. 443]; Cal. Const., art. I, § 16) preclude the application of the amendment to cases arising before its effective date [citation]." (*People* v. *Murphy* (1972) 8 Cal.3d 349, 352, fn. 2 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Cannady* (1972) 8 Cal.3d 379, 383, fn. 1 [105 Cal.Rptr. 129, 503 P.2d 585].) While the United States Supreme Court evidently has not interpreted the ex post facto provision of the federal Constitution so broadly, the California Constitution may well have a different rule.[6]

In *People* v. *Benefield, supra,* 67 Cal.App.3d 51, the defendant, a minor, was tried as an adult in the superior court. Upon conviction, he was sentenced to state prison. The law at that time permitted such a sentence. Afterwards, a new statute was enacted which provided, as relevant, that a minor under 18 years of age at the time of the offense could not be directly sentenced to state prison. A year later, the statute was amended to provide that the minor could be sentenced to state prison after an evaluation and report by the California Youth Authority. Either of the statutory changes would benefit, and in effect impose a lighter penalty on, the defendant. It was apparent, however, that the new statute as originally enacted would be the lighter of the two. The defendant argued that only the new statute as originally enacted could be applied to him, because the amendment was harsher. The court rejected this contention, relying on the rule of statutory interpretation enunciated in *In re Estrada* (1965) 63

---

[6]Petitioner relies on *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773], for the proposition that *Dobbert* is not the law in California. *Teron,* another California case considering retroactive application of the reinstated death penalty, held that *Dobbert* did not apply. *Dobbert* did not apply because, while the United States Supreme Court considered a case in which Florida had already determined that the second death penalty statute was intended to apply retroactively, the California Supreme Court determined as a matter of statutory interpretation that the reinstated death penalty was not intended to have a retroactive effect. The California court thus avoided the question of ex post facto effect. (*People* v. *Teron, supra,* 23 Cal.3d 103, 118.) *Teron* is therefore irrelevant on the issue of the ex post facto effect of laws.

Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948]. *Estrada* dealt with the question whether, in the absence of an express statement from the Legislature, an amendatory statute which mitigated punishment should be applied retroactively. "*In re Estrada* . . . held it to be 'an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.' (63 Cal.2d, p. 745.) Such an inference will also reasonably apply to the latter of two successive statutes ameliorating the penalty of the crime of which the accused was convicted. And *In re Estrada* concluded that the Legislature 'must have intended that the amendatory statute should operate in all cases not reduced to final judgment at the time of its passage.' (63 Cal.2d, p. 746.) The rationale of *In re Estrada* is reasonably applicable to the instant contention of Benefield's appeal. We find it to be the legislative intent that the punishment-mitigating provisions of section 707.2, as amended and now in effect, shall 'operate in all cases not reduced to final judgment at the time of its passage.' " (*People* v. *Benefield, supra,* 67 Cal.App.3d 51, 58-59.)

We are not here concerned with whether the Legislature intended the first or the second of two ameliorative statutes to retroactively apply. This is not a situation in which the Legislature has made no express provision for retroactive application of either statute. We therefore are not called upon to ascertain the legislative intent by means of statutory interpretation. The Legislature expressly stated that the DSL as operative on July 1, 1977, was applicable to petitioner, and expressly conferred the ameliorative benefits of the DSL on him. Thereafter, the legislative intent is irrelevant with respect to any amendatory act which imposes a harsher penalty, even though such penalty may be less than that under the ISL.

The Attorney General argues that *Greenholtz* v. *Nebraska Penal Inmates, supra,* 442 U.S. 1 [60 L.Ed.2d 668, 99 S.Ct. 2100] undercuts petitioner's argument that he had a substantial or vested right in a maximum 18-month parole period.

In *Nebraska Penal Inmates,* the United States Supreme Court faced the question whether the due process clause of the Fourteenth Amendment applies to discretionary parole release determinations made by the Nebraska Board of Parole.

The Supreme Court rejected the argument that whenever the state provides a possibility of parole it creates a reasonable entitlement to the

conditional liberty afforded by parole. The court distinguished between parole revocation, i.e., the loss of freedom which one already has; and the possibility of parole release; i.e., a mere hope of freedom. A liberty or property interest is protected under the due process clause only if the claimant has a legitimate claim of entitlement to it. The mere anticipation or hope of receiving a grant of conditional liberty does not rise to the level of a protectible right. (*Greenholtz* v. *Nebraska Penal Inmates, supra,* 442 U.S. 1, 7-11 [60 L.Ed.2d 668, 675-678, 99 S.Ct. 2100, 2103-2105].)

The Attorney General argues from this that petitioner likewise had a mere anticipation or hope of discharge from parole. Consequently, no substantial or vested right was harmed by the decision to extend his parole.

The Attorney General has misconstrued *Nebraska Penal Inmates* as it applies to the instant case. First, the United States Supreme Court held that, despite the general principle that the mere possibility of parole does not create an entitlement to parole, the language of the Nebraska parole statute at issue did in fact create a legitimate expectation of release on parole which was subject to the requirements of due process. (*Greenholtz* v. *Nebraska Penal Inmates, supra,* 442 U.S. 1, 11-13 [60 L.Ed.2d 668, 678-679, 99 S.Ct. 2100, 2105-2106].) Thus, although a parolee has no general right to discharge before the expiration of a lawful sentence, a statute may create a legitimate expectation of or entitlement to an earlier release. Second, the Supreme Court noted at the outset of its opinion that the Nebraska statutes provided for both mandatory and discretionary parole. (*Id.,* at p. 4 [60 L.Ed.2d 668, 673, 99 S.Ct. 2100, 2102].) Only *discretionary* parole was involved in *Nebraska Penal Inmates.* The court's comments that there was no legitimate expectation of parole release did not apply to the mandatory parole provisions. In the instant case, the former DSL provided for *mandatory* discharge after 18 months parole. Petitioner therefore had a legitimate entitlement to discharge from parole.

In concluding, we take note of the particular circumstances of this case. First, of paramount importance, is the fact that the Legislature expressly stated that the DSL as operative on July 1, 1977, was applicable to prisoners who committed their crimes before that date. The Legislature expressly conferred the benefits of the DSL on petitioner and placed him in the position as if the DSL parole provisions were the law at the time he committed his offense. Second, petitioner was actually paroled under the provisions of the DSL as operative on July 1, 1977, and was required under that statute to be discharged on the date set. Third, petitioner

committed no parole violation between the effective date of the amendment to the parole provisions and the date of his scheduled discharge. In these enumerated circumstances, we hold that the application of the new longer periods of parole to petitioner violates the constitutional prohibition against ex post facto laws, because it acts retroactively to deprive him of a vested right to which he became entitled under the prior statute.

The parties have argued at considerable length the question whether the Legislature intended the new DSL parole terms to apply retroactively. Petitioner argues that, as a matter of statutory construction, the amended parole provisions were not intended to be applied retroactively. He cites Penal Code section 3, which provides: "No part of [the Penal Code] is retroactive, unless expressly so declared." The Attorney General argues, on the other hand, that the Legislature did intend the new parole terms to apply retroactively.

The statute before us is, however, unambiguous. Section 3000, subdivision (b) provides for a three-year parole period and clearly states that "[t]his subdivision shall be also applicable to inmates who committed crimes *prior to July 1, 1977*, to the extent specified in Section 1170.2." (Italics added.)[7] It is unnecessary to inquire into legislative intent or to engage in statutory construction. The statute on its face clearly applies the new three-year parole period to persons in petitioner's situation. The question then becomes simply whether the application of the new parole period to petitioner is constitutionally permissible. We have held that it is not. The legislative intent is irrelevant to such a determination.

### DISPOSITION

The petition for writ of habeas corpus is granted. For the reasons heretofore stated, petitioner is entitled to be discharged from custody.

Gardner, P. J., and Kaufman, J., concurred.

---

[7]Although this clause was initially included in the DSL as originally enacted in 1976, it was retained when the subdivision was amended in 1978. Therefore, as amended, the subdivision is expressly applicable to inmates who committed crimes prior to July 1, 1977. We can only conclude that the Legislature intended that the new parole terms should apply to such inmates.