[Crim. No. 9939. Third Dist. June 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY EUGENE HENDERSON, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, and Stephen Berlin, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney

General, Joel E. Carey and Arthur G. Scotland, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PUGLIA, P. J.**—We deal here with recently enacted legislation providing the mechanism to extend the commitments of certain mentally disordered sex offenders (MDSO). The defendant, committed as an MDSO, challenges the constitutionality of Welfare and Institutions Code section 6316.2 (Stats. 1977, ch. 164, § 3; all further statutory references are to sections of the Welfare and Institutions Code unless otherwise indicated); he aims his major thrust, however, at the permitted scope of expert testimony received at his trial conducted pursuant to section 6316.2. The trial resulted in a one-year extension of defendant's MDSO commitment. We shall affirm the judgment.

Defendant was charged by felony complaint filed August 11, 1975, with (1) forcing a minor to copulate him orally (Pen. Code, § 288a), (2) willfully causing a child to suffer unjustifiable physical pain and mental suffering under circumstances likely to produce great bodily injury and death (Pen. Code, § 273a, subd. (1)), and (3) assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)). These offenses were alleged to have been committed August 6, 1975, upon a four-year-old boy. Defendant entered a plea of guilty before the magistrate to the felony charge of violation of Penal Code section 273a, subdivision (1), and was certified thereon to the superior court for further proceedings (Pen. Code, § 859a).

On December 9, 1975, the superior court adjourned criminal proceedings and certified defendant for hearing and examination to determine if he was an MDSO (§ 6302). Thereafter, defendant was found to be an MDSO and, on January 6, 1976, was committed to the Department of Mental Health for confinement in Atascadero State Hospital.

On March 28, 1978, the People timely filed a petition in superior court to extend defendant's commitment as an MDSO under section 6316.2. The court appointed psychiatrists to examine defendant. (§§ 6316.2, subd. (e), 6307.) Thereafter a trial was held before a jury which sustained the petition. As a result, on July 26, 1978, defendant

was recommitted to the Department of Mental Health for confinement in Atascadero State Hospital for the extended term of one year. ■ ■■■ Defendant timely filed notice of appeal.[1]

## I.

### Admissibility of Expert Testimony That Defendant Constituted a Serious Threat of Substantial Harm to Others.

At trial it was shown that defendant had committed the underlying criminal offense upon Alex P., the four-year-old son of the family with whom defendant was then staying. While defendant was babysitting the child, he became furious with him for repeated bedwetting and beat him severely. During the beating, defendant became sexually aroused and forced the boy to copulate him orally. The child suffered severe injuries, including wounds to his genitals, all of which required his hospitalization for three days.

During his initial commitment, defendant told a psychiatric technician at Atascadero that he had several times before spanked another child and become sexually aroused. While at Atascadero, defendant repeatedly broke the rules; his behavior there was marked by anger, acts of verbal and physical aggression and resistance to therapy. In the past, defendant had also habitually made obscene telephone calls.

Several mental health experts testified at defendant's extended commitment hearing. The significance of their testimony to this appeal can best be understood in relationship to the relevant terms of section 6316.2, the extended commitment statute, which at the time of defendant's trial provided in part: "(a) A person may be committed beyond the term prescribed by Section 6316.1 only under the procedure set forth in this section and only if such person meets all of the following:

---

[1]On its face, the present appeal appears moot because defendant's one-year extended commitment has now expired. However, the records of this court, of which we take judicial notice (Evid. Code, § 452, subd. (d)(1)), disclose that prior to the expiration of the extended one-year commitment with which this appeal is concerned, a second proceeding extended defendant's commitment for another year to end on August 7, 1980; a separate appeal from the second extension is now pending before this court. Since any defects which would invalidate the first extension of commitment would necessarily render all subsequent extension orders invalid (§ 6316.2, subd. (h); *In re Acosta* (1971) 21 Cal.App.3d 51, 54 [98 Cal.Rptr. 208]; *People v. Thomas* (1968) 260 Cal.App.2d 196, 199-201 [67 Cal.Rptr. 234]), the present appeal is not moot.

"(1) The 'sex offense' as defined in subdivision (a) of Section 6302 of which the person has been convicted is a felony,...[2]

"(2) Suffers from a mental...disorder, and as a result of such mental disorder, is predisposed to the commission of sexual offenses to such a degree *that he presents a serious threat of substantial harm to the health and safety of others.*" (Italics added.)[3]

Each of the People's experts testified in detail that defendant met the statutory criteria for extended commitment. Their conclusions were based on somewhat different theories.

Dr. Wilcox, a psychiatrist with 12 years of experience, diagnosed defendant as having a character disorder of a nonspecific nature. He ruled out pedophilia. Dr. Wilcox believed that because defendant had not developed sufficient psychological insight, he remained predisposed to the commission of sexual offenses and constitutes a serious threat of substantial harm to others.

Dr. Bennett, a psychiatrist with 25 years of experience, ascribed to defendant the specific character disorders of aggressive sexuality and male pedophilia. Dr. Bennett based his diagnosis on defendant's history including the commitment offense, obscene telephone calls, and reported sexual fantasies. Because of the seriousness of the commitment offense and the lack of perceived change in defendant's pattern of rule-breaking and aggressiveness, Dr. Bennett believed defendant predisposed to the commission of sexual offenses to the extent he constituted a serious threat of substantial harm to others.

---

[2]The definition of "sex offense" in section 6302, subdivision (a), includes "...any felony...which is shown by clear proof...to have been committed primarily for purposes of sexual arousal or gratification."

[3]The criterion that the person present "a serious threat of substantial harm to the health and safety of others" has been changed to require now that he present "a substantial danger of bodily harm to others" (Stats. 1979, chs. 991, 992). Both criteria refer not only to existing mental state but also to the probability of a certain type of future behavior. Whether such predicted behavior constitutes "a serious threat of substantial harm" or "a substantial danger of bodily harm" to others is, we think, a distinction of no significance to the resolution of defendant's challenge to the permitted scope of expert testimony.

An earlier amendment to section 6316.2 substituted "disease, defect or disorder" for "disorder" in subdivision (a)(2) (Stats. 1978, ch. 1036, § 1; Stats. 1978, ch. 1039, § 2).

Dr. Bitter, a psychologist, diagnosed defendant as a sociopath, a psychopathic character disorder manifested in impulsive behavior and lying. Based on the nature of the commitment offense, defendant's history and reported sexual fantasies, including a preoccupation with sexual dominance, Dr. Bitter also believed defendant predisposed to the commission of sexual offenses and a serious threat to do substantial harm to others.

Dr. Whippel, a psychiatrist with 16 years of experience, testified for the defense that in his opinion the commitment offense and defendant's past history provided an insufficient basis to establish defendant's predisposition to commit a sexual offense such that he would present a serious threat of substantial harm to others.

Prior to the testimony of each of the People's expert witnesses, defendant challenged their qualifications to render an opinion whether defendant constituted a serious threat of substantial harm to the health and safety of others. After hearing, the court denied each such challenge and ruled each witness qualified to render an opinion on the subject.

At trial, defendant conceded the qualifications of the experts to render their opinions on his mental state. He reiterates that concession here. ■ Defendant contends, however, that psychiatric opinions to the effect that he presents a threat of substantial harm to the health and safety of others were erroneously admitted because such testimony does not meet the minimal standards for admissibility, i.e., proven reliability and general acceptance in the relevant, professional community of the clinical method of examination as a mode for extrapolating predictions of future behavior. Defendant contests the qualifications of psychiatrists, psychologists and other mental health professionals to render expert opinions on such questions, arguing that the state of the art is not sufficiently advanced to enable such professionals to make "predictive judgments" about a person's future behavior with sufficient reliability to be accepted as evidence.

By framing the question in this way, defendant seeks to foreordain the answer. Indeed, if the lack of confidence within the psychiatric community concerning the capacity of its practitioners to predict future behavior is as general as defendant contends, the question as posed by defendant assumes the rhetorical form.[4]

---

[4]The following articles were cited by defendant to the trial court to indicate the extent of psychiatric skepticism concerning the predictive powers of mental health

It is obvious that an opinion that an individual poses a serious threat of substantial harm to others constitutes at least in part a prediction as to that person's future conduct. But in the context of MDSO proceedings, such an opinion also includes a significant contemporary component. It speaks as well to the *present* proclivities of the individual; it says that he is at this moment fully *capable* of conduct dangerous to the health and safety of others, and that the acting out of these aggressive propensities can be anticipated upon the unfortunate convergence of stimulus and opportunity. Thus whether the predictive component of the expert's opinion is ever validated by future events will likely depend on circumstances beyond the control of the actor. However, the very real statistical possibility that the prediction may never be fulfilled does not detract from the validity of the expert's opinion as to the *present* threat of substantial harm posed by the defendant.

In its present dimension, the expert's opinion is merely one way of characterizing defendant's existing mental condition, a subject relevant to these proceedings in which the expert is called upon to examine for and diagnose mental disorders which predispose to the commission of sexual offenses. Courts of this state have long recognized that a psychiatric expert's appraisal of an individual's dangerousness (serious threat to do substantial harm) is directly related to the expert's evaluation of that person's existing mental state. (*People v. Hines* (1967) 66 Cal.2d 348, 355 [57 Cal.Rptr. 757, 425 P.2d 557]; *People v. Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398]; *People v. Bickley* (1962) 57 Cal.2d 788, 793 [22 Cal.Rptr. 340, 372 P.2d 100].) As we have noted, defendant concedes the competence of the People's experts to testify to their opinion of defendant's present mental state.

Recently the United States Supreme Court has pointed out that "Whether the individual is mentally ill and *dangerous to either himself or others*...turns on the meaning of the facts which must be interpret-

---

professionals: Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa.L.Rev. 439; Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom* (1974) 62 Cal.L.Rev. 693; Hunt & Wiley, *Operation Baxstrom After One Year* (1968) 124 Am.J.Psych. 974; Rappeport et al., *Evaluation and Follow-up of State Hospital Patients Who Had Sanity Hearings* (1962) 118 Am.J.Psych. 1078; Steadman, *Follow-Up on Baxstrom Patients Returned to Hospitals for the Criminally Insane* (1973) 130 Am.J.Psych. 317; Steadman & Keveles, *The Community Adjustment and Criminal Activity of the Baxstrom Patients: 1966-1970* (1972) 129 Am.J.Psych. 304; Task Force Report, Clinical Aspects of the Violent Individual (Am. Psych. Assn., 1974) p. 25; Wenk et al., *Can Violence Be Predicted?* (1972) 18 Crime & Delinquency 393.

ed by expert psychiatrists and psychologists." (Italics added; *Addington v. Texas* (1979) 441 U.S. 418, 429, 330, [60 L.Ed.2d 323, 333, [99 S.Ct. 1804]].) "Psychiatric diagnosis...is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." (*Ibid.*) "The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." (*Ibid.*) Even so, an estimate of an individual's dangerousness is a proper subject for expert psychiatric evaluation and testimony and must be considered by the finder of fact. (*Ibid.*) The mere fact that lay persons may be able rationally to draw the same inferences as to dangerousness from the same facts without the assistance of expert testimony does not deprive that testimony of all value where it is nonetheless "relatively illuminating" (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 174-175 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]). At least that much may be said for the predictive judgment of a mental health professional whose opinion of an individual's dangerous propensities is a "judgment which doctors and professionals must regularly render under accepted rules of responsibility." (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 438 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

In proceedings under the MDSO statute, the court is required "with the assistance of psychiatrists" to identify those who come within the reach of the statute. (*People* v. *Allen* (1973) 29 Cal.App.3d 932, 935 [106 Cal.Rptr. 43]; *In re Perkins* (1958) 165 Cal.App.2d 73, 78 [331 P.2d 712].) In proceedings under section 6316.2, the court is required to appoint the necessary psychologists or psychiatrists "in accordance with this article...." (§ 6316.2, subd. (e).) Section 6307 provides that the court shall appoint "not less than two nor more than three certified clinical psychologists...or psychiatrists...to make a personal examination of the alleged mentally disordered sex offender, *directed toward ascertaining whether the person is a mentally disordered sex offender*" (italics added). What then is the precise scope of the expert's inquiry under section 6307? The answer is provided in section 6300: "...'mentally disordered sex offender' means any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is *dangerous to the health and safety of others*." (Italics added.)

Thus appointed psychological and psychiatric experts have long been required by statute in original MDSO commitment proceedings to bring to bear on the question of an individual's future conduct, i.e., his dan-

gerousness, their admittedly imprecise diagnostic techniques. Viewed in this perspective, the techniques employed by the experts herein are neither new nor experimental (cf. *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]). Although admittedly those techniques do not produce certainty, the significance of this failure to meet an ideal of perfection is a consideration for the trier of fact in weighing the effect of the testimony. (*Schnear* v. *Boldrey* (1971) 22 Cal.App.3d 478, 484 [99 Cal.Rptr. 404]; *People* v. *Stuller* (1970) 10 Cal.App.3d 582, 597 [89 Cal.Rptr. 158, 41 A.L.R.2d 512]; *People* v. *Brekke* (1967) 250 Cal.App.2d 651, 661-662 [58 Cal.Rptr. 854].)

The People's experts all acknowledged that there is disagreement within the psychiatric profession concerning the predictive ability of its practitioners. However, they all implicitly share the opinion that, given certain facts, predictions of future dangerousness may rationally be projected, and that the drawing of such inferences is properly within the expertise of qualified mental health professionals.

The qualification of an expert is a matter addressed to the sound discretion of the trial judge whose determination will be upheld unless a clear abuse of discretion is shown (*Evans* v. *Ohanesian* (1974) 39 Cal. App.3d 121, 127 [112 Cal.Rptr. 236]). The trial court acted within its discretion in admitting expert testimony that defendant constituted a substantial threat of harm to the health and safety of others.

## II.

### Constitutional Challenges to Section 6316.2

A.   Ex Post Facto Issue.

■    Defendant argues that section 6316.2 as applied to him is an ex post facto law, prohibited by both the federal and state Constitutions. (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9.) We disagree.

At the time of defendant's offense in 1975 and his MDSO commitment in January 1976, a violation of Penal Code section 273a, subdivision (1), was punishable by a maximum term of 10 years in prison (Stats. 1965, ch. 697, § 1). However, under section 6316, defendant's MDSO commitment was of indefinite duration, up to life. (Stats. 1971, ch. 1593, § 418.) Effective and operative January 1, 1977, section 6316 was amended to provide an indeterminate term of confine-

ment under an MDSO commitment not to exceed, however, the aggregate maximum term of imprisonment which a defendant could receive if sentenced for the commitment offense. (Stats. 1976, ch. 1101, § 9.) This amendment reduced defendant's maximum term of confinement as an MDSO from life to 10 years in conformance with the maximum term provided for violation of Penal Code section 273a, subdivision (1), at the time of defendant's offense and MDSO commitment.

In 1976, the Legislature enacted the uniform determinate sentencing Law (DSL) which reduced the maximum penalty for violation of Penal Code section 273a, subdivision (1), to three years in state prison. (Stats. 1976, ch. 1139, §§ 165, 273.) While the DSL was enacted in 1976, and became effective on January 1, 1977, it expressly did not become operative until July 1, 1977. (Stats. 1976, ch. 1139, § 351.5.)

Shortly after the passage of the DSL, the Legislature added Welfare and Institutions Code section 6316.2 to provide a procedure to extend the maximum term of confinement for certain MDSO's; section 6316.2 was effective June 29, 1977, and operative on July 1, 1977, the same date as the DSL. (Stats. 1977, ch. 164, §§ 3, 6, 7; Stats. 1976, ch. 1139, § 351.5.)

Because defendant was incarcerated as an MDSO during the period from January 1, 1977, until July 1, 1977, he argues that the application of the extended commitment provision of section 6316.2, which was effective and operative subsequent to the January 1, 1977, *effective* date of the DSL, would constitute an ex post facto punishment. He claims that for ex post facto purposes he obtained a "vested interest" in the maximum three-year term fixed by the DSL as of its effective date rather than its operative date and cites as authority *Ross* v. *Board of Retirement* (1949) 92 Cal.App.2d 188, 193 [206 P.2d 903].

Defendant's reliance on *Ross* is misplaced. The *Ross* court was concerned with the limited question of whether an individual attained a vested interest in retirement privileges as of the effective date of a local ordinance, rather than at the time of its operative date. In order to give effect to the manifest legislative intent, the court held that the effective date of the ordinance controlled (see *People* v. *Hinojosa* (1980) 103 Cal.App.3d 57, 62 [162 Cal.Rptr. 793]). By contrast, we confront here statewide legislation which, in an abrupt break with time-honored practice, discards the hoary Indeterminate Sentence Law (ISL) and replaces it with a comprehensive system of determinate sentencing. Or-

derly transition required the Legislature to enact and render operative at one time all the components of the DSL and the many related changes required thereby. It was obviously necessary therefore to make the passage of certain provisions contingent on the passage of other interrelated provisions. (E.g., Stats. 1976, ch. 1139, § 349.5.)

Under the California Constitution, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment except where the statute is passed as an urgency measure and becomes effective sooner. (Cal. Const., art. IV, § 8, subd. (c)(1).) In the usual situation, the "effective" and "operative" dates are one and the same, and with regard to ex post facto restrictions, a statute has no force and effect until such effective-operative date. (*DeWoody* v. *Superior Court* (1970) 8 Cal.App.3d 52, 56 [87 Cal.Rptr. 210].) Yet, as here, the Legislature may deem it necessary to postpone the operation of certain statutes until a later time. (See 26 Ops.Cal.Atty.Gen. 141, 143 (1955).) Just as the Legislature may provide for an operative date subsequent to an effective date of a statute to allow persons affected to become acquainted with and implement its provisions (see *op. cit.*, *supra*, at p. 144; 2 Sutherland, Statutory Construction (3d ed. rev. 1973) § 33.07, p. 12), the Legislature may also wish to postpone the operative date to provide time for emergency clean-up amendments and the passage of interrelated legislation.

Thus, in the context of the comprehensive determinate-sentence legislation involving extensive statutory revision, where the Legislature specifically provides for uniform postponement in the operative date of the entire legislative scheme, we do not think the Legislature intended that a criminal defendant would accrue a vested interest in the application of only a small part of the whole on its effective date. (*People* v. *Hinojosa, supra,* 103 Cal.App.3d at pp. 65, 66.)[5] ■ An enactment is a law on its effective date only in the sense that it cannot be changed except by legislative process; the rights of individuals under its provisions are not substantially affected until the provision operates as law.

"[A]n ex post facto law is "'one which, in its operation, makes that criminal or penal which was not so at the time the action was performed; or which increases the punishment; or, in short, which, in

---

[5]Retroactive application of a punishment-mitigating statute is not a question of constitutional right but of legislative intent. (*In re Estrada* (1965) 63 Cal.2d 740, 744 [48 Cal.Rptr. 172, 408 P.2d 948].)

relation to the offense or its consequences, alters the situation of a party to his disadvantage."""(*People* v. *Benefield* (1977) 67 Cal.App.3d 51, 58 [136 Cal.Rptr. 465], quoting *Thompson* v. *Missouri* (1898) 171 U.S. 380, 383 [43 L.Ed. 204, 206, 18 S.Ct. 922].) ■ Since defendant could not have acquired a vested right in the ameliorative provisions of the DSL prior to its operative date (see *In re Harper* (1979) 96 Cal.App.3d 138, 139-140 [157 Cal.Rptr. 759]; *In re Bray* (1979) 97 Cal.App.3d 506, 510, 516 [158 Cal.Rptr. 745]), the application to him of section 6316.2, operative at the same time as the DSL, could not constitute an ex post facto penalty.

B.   Equal Protection Issue.

■ Defendant contends that section 6316.2, by singling out for extended commitment what he calls "amenable MDSO's" creates an unconstitutional classification in violation of equal protection of the laws guaranteed by both the federal and state Constitutions.

To the contrary, the California Supreme Court has recently indicated that MDSO's may be subjected to a period of extended commitment once the maximum term of punishment has expired without violating equal protection of the laws if the People establish that the person committed remains a danger to the health and safety of himself or others. (*In re Moye* (1978) 22 Cal.3d 457, 467 [149 Cal.Rptr. 491, 584 P.2d 1097].)

Commitment of MDSO's to a state hospital is for the purposes of treatment not punishment. (22 Cal.3d at p. 466; § 6316.2, subd. (i).) Implicit in the MDSO statutory scheme is the legislative finding that certain MDSO's shall be committed to a state mental health facility because of their mental status, i.e., because they are in need of and will benefit by the special treatment afforded there. This difference in mental condition between the classes of ordinary offenders, "non-treatable" MDSO's and "treatable" MDSO's is an adequate constitutional ground for the difference in the terms of commitment of the classes, applying the requisite "compelling interest" standard since personal liberty is at stake. (*People* v. *Superior Court* (*Riggs*) (1978) 80 Cal.App.3d 407, 414 [145 Cal.Rptr. 711]; see also *In re Moye, supra,* 22 Cal.3d at pp. 462, 465; *In re Franklin* (1972) 7 Cal.3d 126, 146 [101 Cal.Rptr. 553, 496 P.2d 465]; cf. *People* v. *Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92].)

## C. Due Process of Law Issue.

■ Defendant contends that section 6316.2 violates due process of law because the standards for release from commitment as set forth in other statutes (§§ 6325, 6325.1, 6327) are more "difficult" to meet than the standards for commitment in section 6316.2.[6]

Defendant argues that in order for any civil commitment statute to "pass constitutional muster," the standards for release must "equate with the absence of the requirements for commitment." Otherwise, he argues, a person "might" remain involuntarily confined in a mental institution after he has improved to the point where he could not be committed. We reject this contention and its supporting arguments.

Defendants relies upon the case of *O'Connor* v. *Donaldson* (1975) 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486], which held that Florida cannot constitutionally confine in a mental hospital a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. In so holding, the court stated that "The fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement. [Citations.] Nor is it enough that Donaldson's original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." (422 U.S. at pp. 574-575 [45 L.Ed.2d at p. 406].

*O'Connor* was a civil suit for money damages against the superintendent of a state hospital who, in reliance on a state law, had allegedly held a mental patient in a hospital for nearly 15 years when the patient was dangerous to no one. The case did not involve statutes of the nature with which we are here concerned. As pointed out by the Supreme Court, the Florida commitment statutes provided "*no judicial procedure* whereby one still incompetent could secure his release on the ground that he was no longer dangerous to himself or others." (Italics added; 422 U.S. at pp. 566-567, fn. 2 [45 L.Ed.2d at pp. 401-402, fn. 2].)

---

[6]The standards for commitment are set forth and discussed in part I, *ante*. The standards for release from commitment are that the person will not benefit from further care and treatment and that he is no longer a danger to the health and safety of others. (§§ 6325, 6325.1, 6327.)

The *O'Connor* opinion has no applicability to the California statutory pattern. (Cf. *Suzuki* v. *Quisenberry* (D.Hawaii 1976) 411 F.Supp. 1113.) The California statutes provide a comprehensive scheme for the release of MDSO's under appropriate circumstances. (§§ 6325, 6325.1, 6327.) The statutes incorporate all the fundamental aspects of fair play by providing the MDSO with abundant safeguards and means for continuous review of his mental state. The statutes may logically be interpreted to require the patient's discharge when the basis for the original commitment no longer exists. (See *People* v. *Youngs* (1972) 23 Cal.App.3d 180, 183-184 [99 Cal.Rptr. 901]; *Suzuki* v. *Quisenberry, supra,* 411 F.Supp. at p. 1134.) We note, finally, that an MDSO who claims he no longer fits the commitment criteria is entitled to judicial relief via a writ of habeas corpus. (See *In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201].)

■ Defendant also contends that section 6316.2 is in violation of due process of law since it does not require proof that he committed a *recent* overt act indicating that he presents a serious threat of substantial harm to the health and safety of others. This contention is based on federal district court decisions which have used language indicating under various circumstances that in order constitutionally to confine a person because he might in the future be dangerous, it must be shown he has actually been dangerous in the "recent" past. (See, e.g., *Lynch* v. *Baxley* (N.D. Ala. 1974) 386 F.Supp. 378, 391; *Lessard* v. *Schmidt* (E.D. Wis. 1972) 349 F.Supp. 1078, 1093; *Bell* v. *Wayne County General Hospital at Eloise* (E.D. Mich. 1974) 384 F.Supp. 1085, 1096.) These cases do not require, as a matter of constitutional law, that the statute specifically provide for "recent" acts; the evidence is the significant thing.

In the instant case in 1975 defendant committed the offense of which he was convicted. Testimony indicated defendant committed acts of verbal and physical aggression thereafter at Atascadero. Conceding, arguendo, the constitutional requirement of a "recent" overt act, the evidence is present in this case.

■ Defendant contends section 6316.2 violates due process of law in that it is "vague" and therefore void. He argues that to make the findings required by the section, the court must interpret and apply the terms "mental disorder," "predisposed," and "serious threat of substantial harm," all of which, according to defendant, are terms so vague that men of common intelligence must necessarily guess at their mean-

ing and differ as to their application. This being so, defendant argues, it follows the statute is unconstitutional. (See *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]; *In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].)

As a general principle of law the definition of vagueness enunciated by the cases cited by defendant is sound. However, applied to the statute here in question, the principle does not call for invalidating this legislative enactment. Indeed, the principle recently was invoked unsuccessfully to challenge another portion of the MDSO statute. In the case of *People* v. *Kirk* (1975) 49 Cal.App.3d 765 [122 Cal.Rptr. 653], it was asserted the use of the word "dangerous" in the definition of an MDSO in section 6300 was unconstitutionally ambiguous and vague. The court, applying *Lanzetta* and *Newbern*, held such words were subject to dictionary definition and that as used in MDSO cases, juries (or judges) will have to be convinced on a case-to-case basis that a person "does pose a danger to the health and safety of others." (*People* v. *Kirk*, *supra*, 49 Cal.App.3d at p. 771.) We apply the reasoning of the *Kirk* case to the phrases here challenged and hold that those terms can be understood by reference to "demonstrably established technical or common law meaning," and thus may be comprehended by men of ordinary intelligence. (*Id.*, at p. 769.)

## III.

■ Commitment as an MDSO requires antecedent conviction of a "sex offense." Sex offenses within the statute include any crime "committed primarily for purposes of sexual arousal or gratification." (§ 6302, subd. (a).) At issue in the commitment extension proceedings was the question whether the offense for which defendant was convicted, child beating (Pen. Code, § 273a, subd. (1)), was committed primarily for the purposes of sexual arousal or gratification.

Defendant contends that the court erred in refusing to read to the jury his proffered instruction which stated, "such purposes [refer] to the defendant's princip[al] or primary conscious intent at the time the crime was committed." Defendant claims that the instruction defining "purpose" as "conscious intent" was important since the expert witnesses who testified often ascribed subconscious motivation to defendant's actions. Defendant concedes, however, that the usual, ordinary, and common import of the term "purpose" is conscious intent.

It is axiomatic that a court need not instruct a jury on terms which are well understood by all persons of average intelligence. (*People v. Burke* (1962) 208 Cal.App.2d 149, 164 [24 Cal.Rptr. 912].) Furthermore, the trial court properly instructed the jury on the statutory requirement and definition of a "sex offense" and the necessity that it find defendant had the required mental state at the time of the beating in order for the offense to constitute a sex offense under section 6302. There was no instructional error.

## IV.

■ During jury selection, a prospective juror was excused for cause after she revealed that the victim had been her client in psychotherapy "this year." The trial court denied defendant's motion to dismiss the entire panel of prospective jurors. It was within the sound discretion of the court to conclude the prospective juror's statement was nonprejudicial and to refuse to dismiss the entire jury panel. (*People v. Vernon* (1978) 89 Cal.App.3d 853, 865 [152 Cal.Rptr. 765].)

The judgment is affirmed.

Evans, J., concurred.

**BLEASE, J.**—I concur in the result.

The majority opinion labors to resolve issues concerning provisions of a statute not now in effect. Its precedential value must be discounted by its inapplicability to the legislation which now governs.

The opinion interprets criteria for extended commitment which have been significantly amended by legislation effective January 1, 1980. The opinion also rejects constitutional challenges to the MDSO statute on the basis of a standard of amenability for treatment which the Legislature intended to reject by the same legislation. In this posture the case lacks not only the concreteness of facts considered in the light of operative legislation, but also the "'reasonable probability that the same questions will again be litigated and appealed,. . .'" (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 470, p. 4427, citing to *People v. West Coast Shows* (1970) 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290].)

The opinion interprets and considers the constitutionality of Welfare and Institutions Code section 6316.2, as added by Statutes 1977, chap-

ter 164, section 3. The section, subsequently amended by Statutes 1978, chapter 1039, section 2, was to have expired by its own terms on January 1, 1980. On September 22, 1979, the Legislature enacted two measures amending section 6316.2: Assembly Bill No. 1332 (A.B. 1332) and Senate Bill No. 898 (S.B. 898). The measures are contained in chapters 991 and 992 of the Statutes of 1979.

Both chapters contain revisions of section 6316.2 intended to take effect on January 1, 1980. They are double-joined, a legislative device to order the priority of conflicting enactments. (*In re Thierry S.* (1977) 19 Cal.3d 727, 739-740 [139 Cal.Rptr. 708, 566 P.2d 610].) However, a flaw in the double-joining procedure leaves unresolved the issue of priority.[1] The issue of priority may affect the constitutionality of the MDSO law, as shown below. It does not affect the amended criteria for extended commitment since both chapters contain identical amendments. The amendments provide:

"(a) A person may be committed beyond the term prescribed by section 6316.1 . . . only if such person meets all of the following:

---

[1]The flaw in the double-joining procedure arises from its attempted application to chapters having different operative dates. The double-joining procedure is designed to provide a method of choosing which of two measures is to be operative *if both "go into effect on the same day . . . ."* (Italics added.) (Note, *Statutory Construction: Conflicting Acts Passed at the Same Session: Higher Chapter Number Prevails* (1956) 3 UCLA L.Rev. 417; and see Gov. Code, § 9605; *In re Thierry S.* (1977) 19 Cal.3d 727, 739-740 [139 Cal.Rptr. 708, 566 P.2d 610].) However, if it is applied, as here, to chapters, one of which has an urgency clause (and takes immediate effect) and the other does not (and takes effect by law on Jan. 1 following its enactment) the premise upon which double-joining is based is destroyed and confusion engendered. That is what happened to chapters 991 and 992.

The measures were double-joined such that section 2 of the bill given the higher chapter number was to be given effect on January 1, 1980. The sections numbered as 2 in each measure are identical. However, S. B. 898, given the higher chapter number (992) actually took effect on the date of its enactment, September 22, 1979, because of an urgency clause. That is, the higher numbered chapter took effect *before* the lower numbered chapter. Since chapter 992 had an urgency clause, it took effect before chapter 991, making the later effective chapter 991 supersede chapter 992. But the double-joining clause of A. B. 1332 directed that its section 2 take effect *only* if A. B. 1332 were given a *higher* chapter number. That *not* being the case, only section 1 of A. B. 1332 (ch. 991) remains operative on January 1, 1980. A contingency note to chapter 991 in No. 5 Deering's Advance Legislative Service, page 1026, concludes that section 1 of A. B. 1332 (i.e., ch. 991) is operative.

However, the legislative intent seems clear that section 2 of either measure take effect (they are identical) despite the linguistic flaw. To square this with the urgency clause would require that section 2 of chapter 991 take effect.

"...  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"(2) Suffers from a mental disease, defect, or disorder and as a result of such mental disease, defect, or disorder, is predisposed to the commission of sexual offenses to such a degree that he *or she* presents a *substantial danger* of *bodily harm to others*." (Welf. & Inst. Code, § 6316.2, subd. (a).)

It is apparent that amended section 6316.2 makes the predictive (or causal) link between mental disorder and effect much stronger than in the statute before this court by substituting "danger" for "threat" and "bodily" harm for "health and safety." These amendments, affecting "the most basic personal liberty interest" (*People* v. *Saffell* (1979) 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92]), require the closest judicial scrutiny, a task not accomplished by the majority opinion's off-hand assertions that the legislative changes are of "no significance ... to the permitted scope of expert testimony" (majority opn., *ante*, fn. 3), a position which renders without meaning the Legislature's change in language.

The majority opinion also upholds the constitutionality of the MDSO statute on the basis inter alia that "the difference in mental condition between ordinary offender, 'non-treatable' MDSO's and 'treatable'" MDSO's is an adequate constitutional ground for the difference in the commitment of the classes. (Majority opn., *ante*, p. 489.)

But if section 2 of chapter 991 is operative, as the Legislature intended (see *ante*, fn. 1), "[a]menability to treatment is not required for a finding" justifying an extended commitment of an MDSO beyond that served by an ordinary offender for the same offense. The removal of the amenability requirement renders the MDSO statute of doubtful constitutionality. (*People* v. *Compelleebee* (1979) 99 Cal.App.3d 296 [160 Cal.Rptr. 233]; *People* v. *Lakey* (1980) 102 Cal.App.3d 962, 970-972; *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373].)

Appellant's petition for a hearing by the Supreme Court was denied August 28, 1980. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.