[No. A072883. First Dist., Div. One. Nov. 4, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ORLANDO S. CAMBA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I. and II.

## COUNSEL

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Catherine A. Rivlin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**SWAGER, J.**—Appellant was convicted following a jury trial of second degree murder (Pen. Code, § 187, subd. (a)), with personal use of a firearm (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5),[1] and sentenced to a total term of 19 years to life in state prison. On appeal, he objects to the trial court's exclusion of evidence of the victim's gang affiliations, prior violent acts and drug use. He also challenges the reasonable doubt instruction given by the court, and the reduction of his presentence credits pursuant to section 2933.1, subdivision (c). We find that no prejudicial errors were committed and affirm the judgment.

### FACTS

On November 12, 1994, appellant left work at AVP Limited in Cordelia at 11:15 a.m. with his brother Bernard Camba, and his friends Adonis Paragus and Eric Paculan.[2] Their destination was a former residence on Kidder Avenue. Bernard drove the car, appellant was in the front passenger seat, Adonis was seated behind the driver, and Eric was seated behind appellant. A .38-caliber revolver which appellant had purchased for protection from

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]Appellant's brother and his friends will be referred to by their first names to avoid confusion.

"gangs" was in the glove compartment of the car.[3] Appellant thought he had unloaded the gun that day while he was at work, but must have loaded it again before he left.

As they proceeded on Pennsylvania Avenue in Fairfield, the victim, Walter Low, walked across the street and nearly collided with the rear of the car. Low appeared to "want to bump" the car, so appellant retrieved the gun from the glove compartment and ordered his brother to "[m]ake a U-turn" to "scare" Low. As they turned the car around, the victim "just kept on saying something and throwing signs out there that he wants to be bad or something." Appellant displayed the gun, but Low "still didn't run"; instead, the victim motioned to appellant to "come on." Appellant believed Low was "throwing" gang signs, so he pointed the gun at the victim. Without really aiming and just wanting to "scare the guy," appellant pulled the trigger. He was not aware the gun was still loaded.

Appellant heard the gunfire and saw Low fall to the ground. He was "shocked" and said, " 'Let's go, let's go.' " Bernard drove straight home, and appellant disposed of the gun in a lake.

Low was killed by a single shot fired from "indeterminate range" and location which entered his heart and passed through two large blood vessels. At the scene of the shooting, no gun or knife was found in the victim's possession, although a screwdriver was discovered "laying next to" his jacket, as if it had been removed by paramedics.

Appellant's testimony at trial differed in material respects from his confession. Appellant testified that Eric, not he, owned the gun. On the day of the shooting, Eric showed the gun to him at work. He had "never seen a gun before," so he asked Eric if he "could hold it."

Appellant also testified that after they almost collided with the victim on Pennsylvania Avenue, *Eric* said Low was "doing some gang . . . signs" and directed Bernard to turn the car around "to talk to the guy." Then, as they "headed back towards . . . Low," Eric pulled out the gun and placed it on the back of appellant's shoulder. Appellant thought Eric "was going to shoot the guy," so he grabbed the gun and said, "What are you trying to do." Suddenly, Adonis said, "He's coming, he's coming. He got a gun, he got a gun." Low did not appear angry. Appellant observed Low reach inside his jacket, and the others exclaimed that the victim was "reaching . . . for a

---

[3]At trial, the audio- and videotapes of appellant's confessions, given to the police in two separate interviews, were played for the jury; they comprise the bulk of the prosecution's case against appellant.

gun." He feared that Low was armed because he looked like a gang member, and appellant's family had been harassed by gang members in the past. Appellant closed his eyes and "pulled the trigger" of Eric's gun. He did not intend to hit the victim, only to "scare him." He also did not expect the gun to fire. He lied in his confession to protect his brother and his friends, Adonis and Eric.

## DISCUSSION

### I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Sentence Credits.*

Appellant's final contention is that the trial court erred by modifying his sentence credits to reflect only 15 percent of the actual days of confinement served prior to his conviction pursuant to section 2933.1, which was approved as Assembly Bill No. 2716, 1993-1994 Regular Session, on September 21, 1994,[6] rather than 50 percent as specified previously in section 2933. Section 2933.1, when enacted, included an urgency clause, rendering it effective immediately "to protect the public from dangerous repeat offenders who otherwise would be released . . . ." (Stats. 1994, ch. 713, § 1; Assem. Bill No. 2716 (1993-1994 Reg. Sess.).) ▬▬ In the absence of an urgency clause, a statute enacted at a regular session of the Legislature becomes effective on January 1 of the following year. (Cal. Const., art. IV, § 8, subd. (c)(1); *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 488 [166 Cal.Rptr. 20].) Appellant maintains that section 2933.1 does not govern the calculation of his sentence credits for two reasons: First, it was not properly enacted as urgency legislation under the California Constitution, and therefore did not take effect until January 1, 1995, *after* his offense was committed; and second, even if section 2933.1 may be considered a validly enacted urgency measure, it was not "operative" by its terms immediately upon enactment.

### A. *Enactment as an Urgency Measure.*

▬▬ Appellant's claim that the urgency provision of section 2933.1 cannot be given recognition is based upon article IV, section 8, subdivision

---

*See footnote, *ante*, page 857.

[6]The effect of section 2933.1 was to reduce appellant's sentence credits from 378 to 57 days served. He admits a mistake in the calculation of 198 conduct credits by the trial court rather than the correct 188 days under section 2933. Therefore, he asks us to correct the abstract of judgment to award him a total of 566 days of sentence credits.

(d) of the California Constitution, which provides: "Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill. In each house, the section and the bill shall be passed separately, each by rollcall vote entered in the journal, two thirds of the membership concurring. . . ." ▮ If the urgency clause of legislation is found constitutionally unsound, the remainder of the statute is nonetheless valid, and it takes effect "at the regular time appointed by law. [Citations.]" (*People* v. *Phillips* (1946) 76 Cal.App.2d 515, 521 [173 P.2d 392].) ▮ Appellant insists that when the history of the legislation is considered, the urgency clause was not properly passed by a separate roll call vote of each house of the Legislature, and the urgency statement was "no longer relevant" when it was enacted.

We are severely constrained in our review of the section 2933.1 urgency clause. ▮ "Authority is conferred upon the legislature to determine when urgency measures are necessary, and when such necessity has been determined as provided by the Constitution, the judgment of the legislature is final, and will not be interfered with by the courts unless no declaration of facts constituting such emergency is included in the act or unless the statement of facts is so clearly insufficient as to leave no reasonable doubt that the urgency does not exist. (*Hollister* v. *Kingsbury* [(1933)] 129 Cal. App. 420 [18 Pac. (2d) 1006].)" (*Livingston* v. *Robinson* (1938) 10 Cal.2d 730, 740 [76 P.2d 1192]; see also *Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 420-421 [84 P.2d 1034].) "The recitals of necessity and public interest in legislation must be given great weight and every presumption made in favor of their constitutionality (*Monterey County Flood Control & Water Conservation Dist.* v. *Hughes* [(1962)] 201 Cal.App.2d 197, 209 [20 Cal.Rptr. 252])." (*Azevedo* v. *Jordan* (1965) 237 Cal.App.2d 521, 526 [47 Cal.Rptr. 125].)

▮ We find no procedural defect in the legislative approval of the Assembly Bill No. 2716, 1993-1994 Regular Session, September 21, 1994, urgency provision. In the form originally passed in the Assembly, both Assembly Bill No. 2716 and a statement of urgency were separately approved by roll call votes, but neither the bill nor the urgency clause attached to it were then related to reform of prison credits. When the bill was amended in the Senate to add Penal Code section 2933.1, the urgency section was revised to refer to the need to protect the public from the early release of repeat offenders—a statement apparently taken from legislation which had been considered but not enacted the year before—and again both were approved by separate roll call votes. Upon the return of Assembly Bill No. 2716 to the Assembly, the Senate amendments adding section 2933.1 to

the Penal Code "and declaring the urgency thereof, to take effect immediately," were passed by a *single* concurrence roll call vote of more than two-thirds of the membership, apparently in accordance with the Joint Assembly and Senate Rules.[7]

Nothing more is demanded by the Constitution for mere concurrence in amendments to a bill which was already separately passed by each house as an urgency measure. ▇ " '[T]he California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, . . . that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] . . . [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." [Citations.]' [Citations.]" (*California State Employees' Assn. v. State of California* (1988) 199 Cal.App.3d 840, 845-846 [245 Cal.Rptr. 232]; see also *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1453 [29 Cal.Rptr.2d 103]; *State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 755 [16 Cal.Rptr.2d 727].) ▇ As we read article IV, section 8, subdivision (d), each house must approve in two separate votes any bill and its accompanying urgency section. (See Ops. Cal. Legis. Counsel, No. 12227 (Apr. 29, 1957) 2 Assem. J. (1957 Reg. Sess.) pp. 3663-3664.) That was done with Assembly Bill No. 2716, 1993-1994 Regular Session, September 21, 1994, and although the bill subsequently returned in amended form to the house of origin, the single roll call vote concurring in

[7]We have taken judicial notice of rule 27 of the 1995-1996 Joint Rules of the Senate and Assembly, which provides: "When a bill which has been passed in one house is amended in the other by the addition of a section providing that the act shall take effect immediately as an urgency statute and is returned to the house in which it originated for concurrence in the amendment or amendments thereto, the procedure and vote thereon shall be as follows: [¶] The presiding officer shall first direct that the urgency section be read and put to a vote. If two-thirds of the membership of the house vote in the affirmative, the presiding officer shall then direct that the question of whether the house shall concur in the amendment or amendments shall be put to a vote. If two-thirds of the membership of the house vote in the affirmative, concurrence in the amendments shall be effective. [¶] If the affirmative vote on either of such questions is less than two-thirds of the membership of the house, the effect is a refusal to concur in the amendment or amendments, and the procedure thereupon shall be as provided in Rule 28."

We observe that the version of the Joint Rules of the Senate and Assembly provided to us by respondent are for the *1995-1996* legislative session, rather than the *1993-1994* session during which section 2933.1 was enacted. We therefore cannot be certain that section 2933.1 was passed in compliance with rule 27 as it was then effective, and give it little weight in assessing the validity of the vote.

the amendments and the urgency section was valid. Article IV, section 8, subdivision (d) does not require a *second* separate roll call approval of the urgency section of a single bill, even one, such as Assembly Bill No. 2716, 1993-1994 Regular Session, September 21, 1994, drastically altered by amendments. We cannot impose a restriction upon legislative authority which has not been clearly expressed by the Constitution.

■    We also find no flaw in the legislative determination of urgency in the enactment of Assembly Bill No. 2716, 1993-1994 Regular Session, September 21, 1994, to protect the public from *repeat* offenders who would otherwise be released, even though as ultimately enacted Assembly Bill No. 2716 applied to *all* violent felony offenders. " '[I]f the legislature "states facts constituting an emergency so that its action cannot be said to be arbitrary, courts cannot say that it has not performed its constitutional duty, even though they may disagree with the legislature as to the sufficiency of declared facts to constitute a sufficient reason for immediate action." (*Baker* v. *Hill* [(1929)] 180 Ark. 387 [21 S.W.2d 867, 868].)' (*Davis* v. *County of Los Angeles, supra,* 12 Cal.2d at pp. 422-423.)" (*Behneman* v. *Alameda-Contra Costa Transit Dist.* (1960) 182 Cal.App.2d 687, 692 [6 Cal.Rptr. 382].) Given our exceedingly limited reviewing function, we must conclude that the mistaken reference to repeat, rather than all, offenders does not render erroneous the Legislature's finding and declaration of the need to protect the public by immediately implementing the credit reduction scheme of section 2933.1 to forestall the early release of dangerous criminals under previously existing law.

B.    *Effective Date of the Statute.*

■    Even if the urgency clause of section 2933.1 is found valid, appellant argues that the operative date of the statute was still January 1, 1995. He relies upon subdivision (d) of section 2933.1, which specifies: "This section shall only apply to offenses . . . that are committed on or after the date on which this section becomes *operative.*" (Italics added.) Appellant maintains that use of the word "operative" in subdivision (d) of section 2933.1, rather than *effective,* indicates a legislative intent to delay the implementation of the reduction of sentence credits to avoid the confusion in the courts—and associated miscalculation of credits—inevitable with an immediate change in the law. We disagree.

■    " 'Under the California Constitution, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment except where the statute is passed as an urgency measure and becomes effective sooner. [Citation.] In the usual situation, the

"effective" and "operative" dates are one and the same, and with regard to ex post facto restrictions, a statute has no force and effect until such effective-operative date. [Citation.]' *(People* v. *Henderson* (1980) 107 Cal.App.3d 475, 488 [166 Cal.Rptr. 20].) [¶] In some instances, the Legislature may provide for different effective and operative dates. *(Cline* v. *Lewis* (1917) 175 Cal. 315, 318 [165 P. 915]; 57 Ops.Cal.Atty.Gen. 451, 454 (1974).) '[T]he operative date is the date upon which the directives of the statute may be actually implemented. The effective date, then, is considered that date upon which the statute came into being as an existing law.' *(People* v. *McCaskey* (1985) 170 Cal.App.3d 411, 416 [216 Cal.Rptr. 54]; see also *People* v. *Righthouse* (1937) 10 Cal.2d 86, 88 [72 P.2d 867].)" *(People* v. *Jenkins* (1995) 35 Cal.App.4th 669, 673-674 [41 Cal.Rptr.2d 502].)

" 'An enactment is a law on its effective date only in the sense that it cannot be changed except by legislative process; the rights of individuals under its provisions are not substantially affected until the provision operates as law.' ([*People* v. *Henderson* (1980) 107 Cal.App.3d 475,] 488 [166 Cal.Rptr. 20].) . . . [T]he courts have recognized the power of the Legislature to establish an operative date later than the effective date . . . . [Citation.]" *(Estate of Martin* (1983) 150 Cal.App.3d 1, 3-4 [197 Cal.Rptr. 261].) " '[T]he power to enact laws includes the power to fix a future date on which the act will become operative. [Citations.]' [Citation.]" *(Johnston* v. *Alexis* (1984) 153 Cal.App.3d 33, 40 [199 Cal.Rptr. 909].) Our task is to ascertain and promote the legislative intent of the enactment. *(Id.* at p. 41.)

With the enactment of section 2933.1 the Legislature did not specify different effective and operative dates, or otherwise postpone implementation of the law until occurrence of a contingency, as with the restitution statutes found to have delayed legal effects in *People* v. *Palomar* (1985) 171 Cal.App.3d 131, 135-136 [214 Cal.Rptr. 785], and *People* v. *McCaskey* (1985) 170 Cal.App.3d 411, 418 [216 Cal.Rptr. 54]. Section 2933.1, subdivision (d) merely provides that offenses committed before the "operative" date of the statute are excluded from the credit reduction scheme; it does not defer the operative date of the law. We find nothing in the statute which indicates a legislative intent that it is to become operative later than as provided in the valid urgency provision. *(People* v. *Jenkins, supra,* 35 Cal.App.4th at p. 675.) To the contrary, the statement of urgency found in Assembly Bill No. 2716, 1993-1994 Regular Session, September 21, 1994, conflicts with any delayed implementation of the statute. We do not consider the Legislative Committee Analysis of unrelated legislation in 1996, prepared nearly two years later—and which refers to sentences for crimes committed after January 1, 1995, as incurring the 15 percent credit limit of section 2933.1—persuasive in determining the operative date of the statute.

(*Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357].) We also do not think any postponement of operation of the statute was necessary to prepare the trial courts for the change in credit calculations, a relatively simplistic and straightforward task. We conclude that section 2933.1 was operative, as expressly provided, when it was enacted on September 21, 1994, and was properly applied to appellant's sentence by the trial court.

The judgment is affirmed.

Stein, Acting P. J., and Dossee, J., concurred.

A petition for a rehearing was denied December 2, 1996, and appellant's petition for review by the Supreme Court was denied February 19, 1997. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.