Filed 12/28/21  P. v. Haddad CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>  v.<br><br>RAMY NABIL HADDAD,<br><br>   Defendant and Appellant. | C092160<br><br>(Super. Ct. No. STK-CR-FE-2019-0013874) |

Defendant Ramy Nabil Haddad repeatedly threatened a Stockton code enforcement officer and also shot and killed numerous large dogs in his neighborhood. Following his indictment, defendant requested mental health diversion under Penal Code section 1001.36,[1] arguing that his offenses were the result of his underlying mental health disorder.  The trial court denied defendant's request, concluding that while defendant suffered from a mental health disorder contributing to the offenses, he posed an unreasonable risk to public safety.  Subsequently, defendant pleaded no contest to one

---

[1] Undesignated statutory references are to the Penal Code.

1

count of criminal threats and one count of animal cruelty. The trial court ordered defendant to complete five years of formal probation.

On appeal, defendant argues that there was insufficient evidence that he would pose a risk to public safety. He also argues that his five-year probation term is no longer valid under Assembly Bill No. 1950 (2019-2020 Reg. Sess.). We agree with the latter contention but will otherwise affirm the judgement.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant called the victim, a Stockton code enforcement officer, and very graphically threatened to harm him and his family. In addition, defendant shot and killed several of his neighbors' dogs with a "high-powered air rifle." Defendant was charged with committing criminal threats (§ 422, subd. (a)—counts 1, 2, 4, 5, 7, 8, 10 & 11); resisting an officer (§ 69—counts 3, 6, 9 & 12); stalking (§ 646.9, subd. (a)—counts 13-14); animal cruelty (§ 597, subd. (a)—counts 15-20); and misdemeanor vandalism (§ 594, subd. (a)—count 21).

Defendant filed a motion for mental health diversion pursuant to section 1001.36. The prosecution filed an opposition. On May 4, 2020, the court conducted a diversion hearing. Defendant presented the testimony of three witnesses: Dr. Daniel Gutkind; his wife, Nicole Haddad; and himself.

Dr. Gutkind, a psychologist, works with the Department of Veterans Affairs (V.A.). According to Dr. Gutkind, defendant had been diagnosed with posttraumatic stress disorder (PTSD) stemming from his military service. Dr. Gutkind reviewed defendant's V.A. medical file and compiled a treatment plan to assist with defendant's diversion; he recommended that defendant meet with a psychiatrist every one to two months and with a mental health clinician every two weeks. Based on defendant's medical history, he was already meeting regularly with a psychiatrist prior to the events of this case. Dr. Gutkind recommended frequent, scheduled meetings with a clinician,

2

classes, and a support group where he would discuss a particular condition, such as anxiety or PTSD, with other similarly afflicted veterans.

Mrs. Haddad, defendant's wife, testified that she was aware of defendant's mental health issues when they met in 2013. Defendant told her that he received treatment for PTSD, anxiety, depression, bipolar disorder, and pain issues with his back, ankles, and wrists. Mrs. Haddad was defendant's caretaker, and she testified he had been on at least 10 different PTSD medications. She testified that defendant was upset that cats from an adjacent residence roamed their property, and their lot and sidewalk "was covered in [cat] feces." To secure the property from these cats, defendant "welded" a "chain link" fence, which drew a code enforcement complaint. The code enforcement officer insisted that the fence had to be removed. During this time, defendant increased his marijuana use, which correlated with an increase in his anxiety and anger.

Defendant testified that he has many mental health ailments, including PTSD, obsessive compulsive disorder, bipolar disorder, and anxiety, related to his military service. Following his discharge, defendant was diagnosed with PTSD, obsessive compulsive disorder, and bipolar disorder. Defendant "had a mental breakdown" and was admitted to a state hospital. Between 2013 and 2015, defendant completed a program for conditional release from a state hospital (CONREP), where he had to participate in regular therapy, meet with a social worker, and maintain employment. Defendant testified that during the time of the offenses, he stopped taking his prescription medication for anxiety and proceeded to ingest wax, "a marijuana concentrate," which in his view caused him to experience a "drug-induced psychosis."

The prosecutor offered no witnesses but submitted multiple exhibits, including: People's exhibit No. 1, a Stockton police report from 2019 offered to show defendant's violence toward animals; People's exhibit No. 2, a psychiatric competence report from 2020 demonstrating defendant's "homicidal tendencies starting back in 2012"; People's exhibit No. 3, a San Joaquin County sheriff's report from 2012, when defendant was

3

committed to the state hospital, involving defendant's threats to his mother, offered to show defendant's "homicidal reasoning" and "unreasonable risk to public safety"; People's exhibit No. 13, defendant's V.A. medical records offered to demonstrate that defendant "would not respond appropriately to treatment"; People's exhibit No. 14, phone calls from defendant; and People's exhibit Nos. 15 and 16, placement hearing testimony from defendant and Mrs. Haddad blaming his conduct on marijuana, not on his mental health disorders.

Following argument, the trial court denied mental health diversion. The court concluded that defendant suffers from PTSD, a disorder specifically listed in section 1001.36. Next, while the court concluded, based in part on "the extraordinarily detailed vicious comments" heard on recordings, that defendant's mental disorder was "a significant factor" in the offenses, the court acknowledged that the comments also supported the prosecutor's argument that defendant posed an "unreasonable risk of danger to the public safety." Proceeding to the third element required for diversion, the court concluded that, in the opinion of a qualified mental health expert, defendant's mental health condition "would respond to mental health treatment." The court also found that defendant "would consent to diversion" and "would agree to comply with any treatment as a condition of diversion." Nevertheless, the court noted that defendant's "biggest problem" was the final element, that defendant would "not pose an unreasonable risk to public safety, as defined in [section] 1170.18." The court was concerned that, beyond making threats, defendant looked up "the victim's address," learned "the victim's middle name," and searched the Internet to see the contents of "the victim's backyard." The court was not satisfied that defendant would "not pose an unreasonable risk of danger to the public safety." Therefore, the court denied the request.

Subsequently, defendant pleaded no contest to counts 1 and 15, and the remaining counts were dismissed with a waiver pursuant to *People v. Harvey* (1979) 25 Cal.3d 754,

4

758. The trial court suspended imposition of sentence and placed defendant on five years' formal probation.

Defendant filed a timely notice of appeal.

## DISCUSSION

## I

### *Denial of Mental Health Diversion*

Defendant argues that the trial court abused its discretion when it denied his request for mental health diversion because there was insufficient evidence that he posed an unreasonable risk of danger to public safety. As we explain, we find no abuse of discretion.

A defendant may be eligible for pretrial diversion pursuant to section 1001.36 if the defendant has not been charged with a disqualifying offense and the trial court finds: "(1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*People v. Frahs* (2020) 9 Cal.5th 618, 626-627 (*Frahs*); see § 1001.36, subd. (b)(1)(A)-(F), (2)(A)-(H).)

Regarding the latter requirement, section 1001.36 states that pretrial diversion may be granted if "[t]he court is satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community. The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (b)(1)(F).) Section 1170.18 defines " 'unreasonable risk of danger to public safety' [to] mean[ ] an unreasonable risk that the petitioner will commit a new

5

violent felony" described in section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c).) "These violent felonies are known as 'super strikes' and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment." (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242.)

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion. (§ 1001.36, subds. (a), (b)(3) & (c)(1).)" (*Frahs, supra*, 9 Cal.5th at p. 627.)

We review the trial court's order denying mental health diversion for an abuse of discretion. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 (*Moine*); see *Frahs, supra*, 9 Cal.5th at p. 626 ["Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders"].) "A court abuses its discretion when it . . . [citations] . . . bases its decision on express or implied factual findings that are not supported by substantial evidence." (*Moine, supra*, at p. 449.)

When denying defendant's request for pretrial mental health diversion, the trial court expressly stated that it found that there was an unreasonable risk of danger to public safety if defendant was treated in the community. Defendant argues that there was "no reason to speculate that [defendant]'s conduct, while on a treatment regimen, would escalate to the point that he would commit" a super-strike offense. Here, no abuse of discretion occurred when the trial court was not convinced that defendant would not pose an unreasonable risk of danger to public safety if treated in the community. In summarizing the evidence at the diversion hearing, the prosecutor stated that defendant shot at animals, stalked the code enforcement officer, and repeatedly called the officer

6

with threats "to filet his children." The court expressed concern about defendant violently "shooting" animals. The court did not deny diversion based on defendant's threats, although it viewed the threats to commit acts that would qualify as super-strike offenses as "really bad." Rather, the primary basis for denial was defendant's "lengthy internet search" to discover the victim's address, middle name, and backyard contents via a satellite image. We agree with the trial court's conclusion that, together with defendant's acts of shooting multiple neighbors' dogs, this was evidence that defendant posed a risk of acting on his threats and engaging in a super-strike offense such as homicide.

We conclude the facts presented here are distinguishable from those presented in *Moine* and *People v. Williams* (2021) 63 Cal.App.5th 990 (*Williams*), where the defendants successfully convinced Courts of Appeal that they did not pose an unreasonable risk to public safety. In *Williams*, the defendant was convicted of felony stalking after making multiple "extremely disturbing" threats (*id.* at p. 993), such as writing that he would " 'blow [a victim's] fucking head off' " (*id.* at p. 994, fn. 4). The First Appellate District concluded that the trial court erred in finding that the defendant posed an unreasonable risk of danger to public safety for purposes of mental health diversion because his underlying charges were not super strikes, he posed a low risk to public safety in the uncontroverted opinions of two mental health professionals, there was no evidence he owned, possessed, or had access to weapons, and the trial court had previously released the defendant on bond for two years without incident. (*Id.* at p. 1003.)

Likewise, in *Moine, supra*, 62 Cal.App.5th 440, the defendant was convicted of assault following a fistfight and of making criminal threats. (*Id.* at pp. 444-445.) The defendant had threatened that he had a gun and that he was going to come in and kill everyone; however, there was no evidence in the record that he owned, possessed, or had access to guns. (*Id.* at p. 445 & fn. 2.) The Second Appellate District found that the trial

7

court abused its discretion when it determined that the defendant would pose an unreasonable risk of danger to public safety because there were two opinions by psychiatrists that the defendant posed a low risk of committing assault, the defendant had a criminal history of committing misdemeanors, and the circumstances of the pending charges did not rationally support an inference that he was likely to commit a super-strike offense. (*Id.* at p. 451.) The court reasoned the defendant in *Moine* did not meet the "high standard" for super-strike " 'dangerousness' under sections 1001.36 and 1170.18" in large part because, for more than two years, he had been released "into the community on bond[,]" which required a finding that he "was not likely to cause 'great bodily harm to others' if released." (*Id*. at p. 451.)

We find *Williams* and *Moine* distinguishable. In those cases, there was nothing in the record to suggest that the defendants owned or had access to firearms. (*Williams, supra*, 63 Cal.App.5th at p. 1003; *Moine, supra*, 62 Cal.App.5th at p. 445, fn. 2.) Here, defendant's underlying offenses were not super strikes, but they involved his personal use of a high-powered air rifle to kill dogs. Further, in contrast to the defendants in *Williams* and *Moine*, no pretrial release was afforded to defendant and no mental health professional testified that defendant posed a low risk to public safety. In fact, Dr. Gutkind conceded that he "did not have a sense there was any strong indication that [defendant] would be accepted into diversion." On the facts of this case, the trial court could rationally infer that defendant's statements and actions showed that he was capable of a super-strike offense. Accordingly, having carefully reviewed the evidence in the record as a whole, we conclude that the trial court did not abuse its discretion when it denied mental health diversion based on its determination that defendant would pose an unreasonable risk of danger to public safety if treated in the community.

Defendant's claim that the trial court's denial was tantamount to a due process violation also fails. Under the due process clause of the federal Constitution, no state "shall . . . deprive any person of life, liberty, or property, without due process of law."

8

(U.S. Const., 14th Amend., § 1.) One's liberty may not be arbitrarily deprived by a state's implementation of its criminal laws. (*Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175].) Yet the court below did not arbitrarily reject diversion. Rather, it afforded defendant the opportunity to make a prima facie case, considered all the evidence, and carefully rendered a decision in accordance with the provisions of section 1001.36. No procedural due process violation occurred.

## II

### *Probation Term*

At the time defendant was sentenced, section 1203.1 provided that a trial court may grant felony probation "for a period of time not exceeding the maximum possible term of the sentence." Further, it stated that if the "maximum possible term of the sentence [was] five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).) Effective January 1, 2021, Assembly Bill No. 1950 amended section 1203.1, subdivision (a) to limit the probation term for felony offenses to two years, except in circumstances not present here. (Assem. Bill No. 1950 (2019-2020 Reg. Sess.); Stats. 2020, ch. 328, § 2; Cal. Const., art. IV, § 8; Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865-866.)

Defendant contends the revised statute applies to this matter under *In re Estrada* (1965) 63 Cal.2d 740, 744-745 (*Estrada*) because the judgment was not final when the ameliorative amendment took effect and reduced the maximum term of probation to two years. The Attorney General concedes that the new legislation falls within the scope of *Estrada* and, consequently, defendant's probation term should be reduced to two years. We agree with the parties that the amendment applies retroactively.

"Retroactivity of a statute is a question of law subject to our de novo review." (*Bullard v. California State Automobile Assn.* (2005) 129 Cal.App.4th 211, 217.) When a criminal statute is amended after the criminal act but before final judgment, it applies

retroactively if it mitigates the applicable punishment. (*Estrada, supra*, 63 Cal.2d at p. 742.) " '[A] judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 306.) Probation is a form of punishment, and therefore a reduction in the allowable term for probation is a mitigation of the punishment. (See *People v. Edwards* (1976) 18 Cal.3d 796, 801; *People v. Sims* (2021) 59 Cal.App.5th 943, 958 (*Sims*).)

Because Assembly Bill No. 1950 mitigates punishment and there is no savings clause, it operates retroactively. (*Sims, supra*, 59 Cal.App.5th at p. 964 [Assem. Bill No. 1950 is an ameliorative change subject to "the *Estrada* presumption of retroactivity," without a savings clause or other clear indication of intent for it to apply only prospectively]; *People v. Quinn* (2021) 59 Cal.App.5th 874, 879-885 [same]; see *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, 16-17.) As defendant's appeal was pending when Assembly Bill No. 1950 went into effect, he is entitled to a reduced probation term.

The parties disagree on the appropriate remedy—defendant contends we should modify his term of probation; the People contend we should remand the matter to the trial court to modify the term of probation. In *People v. Stamps* (2020) 9 Cal.5th 685, our Supreme Court concluded that a defendant was entitled to the benefit of an ameliorative change in the law—specifically, pursuant to Senate Bill No. 1393 (2017-2018 Reg. Sess.), he was entitled to have the matter remanded for the trial court to exercise its discretion to strike a serious felony conviction enhancement in the interest of justice. (*Stamps, supra*, at p. 699.) However, because the serious felony conviction enhancement was imposed as part of a negotiated stipulated sentence, if the trial court exercised its discretion to strike the enhancement, the People and the trial court were permitted to withdraw approval for the plea agreement. (*Id.* at pp. 707-708.) The defendant was not permitted " ' "to whittle down the sentence 'but otherwise leave the plea bargain intact.' " ' " (*Id.* at p. 706.)

10

Here, the record on appeal reflects that defendant was convicted by a no contest plea. However, the appellate record does not contain copies of the original plea agreement; thus, it is not clear exactly what negotiations took place. The court's statements at the change of plea hearing also do not confirm whether a stipulated sentence was a material term of the agreement. As such, we will follow the remedy employed by the court in *Sims* and remand the matter for resentencing to allow defendant to seek a reduced probation term under Assembly Bill No. 1950 and allow the court to review the status of his probation. (*Sims, supra*, 59 Cal.App.5th at p. 964 [the "defendant is entitled to seek a reduced probation term on remand under Assembly Bill No. 1950"].) However, we express no opinion on whether the People should be allowed to withdraw from the plea, or the trial court be allowed to rescind its approval of the agreement. (See *People v. Stewart* (2021) 62 Cal.App.5th 1065, review granted June 30, 2021, S268787.)

## DISPOSITION

We remand the matter for resentencing to allow defendant to seek a reduced probation term under Assembly Bill No. 1950. In all other respects, the judgment is affirmed.

/s/
RAYE, P. J.

We concur:

/s/
HULL, J.

/s/
KRAUSE, J.

11