Filed 1/23/24  P. v. King CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097031 |
| Plaintiff and Respondent, | (Super. Ct. No. 03F07198) |
| v. | |
| RALPH KING, | |
| Defendant and Appellant. | |

In 2005, a jury convicted defendant Ralph King of second degree murder and attempted murder arising from a shooting carried out by his son.  Defendant contends that the trial court's denial of his petition for resentencing under Penal Code[1] former section 1170.95 (now § 1172.6)[2] is not supported by substantial evidence.  He further argues the

---

[1]     Undesignated section references are to the Penal Code.

[2]     Defendant filed his original petition under former section 1170.95.  During the pendency of that petition, and before the trial court's most recent ruling, the Legislature amended former section 1170.95 effective January 1, 2022.  (Stats. 2021, ch. 551.)  The Legislature later renumbered former section 1170.95 to section 1172.6 effective June 30,

1

trial court's conclusion that defendant acted with implied malice impermissibly contradicts the jury's acquittal of him for first degree murder. Finally, he argues we should reverse his conviction for attempted murder or remand the case for further proceedings on that count. We will affirm.

I

BACKGROUND

A.    *Defendant's Underlying Crimes and Convictions*

In the drive-through lane of a fast-food restaurant, Demarkas King[3] fired a gun into a car. He killed one person, Allen Qualls, and injured another, M.W. Defendant accompanied Demarkas and codefendant Kenneth McClish to the scene of the shooting but remained on the opposite side of a wall while the shooting occurred. (*People v. King* (Oct. 19, 2006 (C050300) [nonpub. opn.] (*King I*).)[4]

As relevant here, the second amended consolidated information charged defendant, Demarkas, and McClish with the murder of Qualls and the attempted murder of M.W. (§§ 187, subd. (a), 664/187, subd. (a).)

Under the substantial evidence standard of review that applies here, we recount the evidence from the record " ' "in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant

---

2022, with no substantive change. (Stats. 2022, ch. 58, § 10.) We will cite to current section 1172.6 throughout this opinion.

[3]    Because defendant and Demarkas King have the same last name, we will refer to Demarkas by his first name. No disrespect is intended.

[4]    We cite to the opinions in defendant's direct appeal and prior section 1172.6 appeal to summarize the procedural history of the case, as permitted by section 1172.6, subdivision (d)(3). We do not use these facts in our analysis but present them to give context to our discussion.

guilty] beyond a reasonable doubt." ' " (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

Defendant is Demarkas's father. At the time of the crime, McClish was the on-site property manager of defendant's apartment complex and also defendant's friend. Defendant lived in McClish's apartment complex but in a different unit. Demarkas lived with his wife and child at a different apartment complex.

The shooting here took place at approximately 11:30 p.m. on August 20, 2003, in the drive-through lane of a fast-food restaurant near defendant's apartment complex. The restaurant was across a large field from the complex. A cinderblock wall separated the fast-food restaurant drive-through lane from the field.

Demarkas testified he had a confrontation with M.W. (also known as Nova Mike) while he was at a gas station, during which M.W. threatened him. M.W. and another man later went to Demarkas's apartment on August 17, 2003, and assaulted him in front of his daughter.[5]

Later that same day, Demarkas's wife told a responding sheriff's deputy that her husband was involved in a fight, but neither Demarkas nor the other man were at the apartment anymore.

M.W. and another man came back a few days later and banged on Demarkas's apartment door, and Demarkas called the police, but the police told him they could not do anything about it.

The day before the shooting, McClish's roommate B.P. overheard Demarkas tell defendant that people had come into Demarkas's home and assaulted him, and the police

---

[5]     Demarkas and defendant shared this same basic information with the investigating detective. The video of those interviews was played for the jury as was defendant's interview.

were not doing anything about it. Defendant was upset about this and said he did not want his family treated like that.

B.P. overheard another conversation between defendant, Demarkas, and a neighbor, on this subject. In that conversation, defendant told Demarkas they had one gun and needed to procure another. Demarkas said he knew where to get a gun, as he had borrowed one before. There were also other conversations in that same time frame involving defendant and Demarkas in which they talked about needing another gun. B.P. heard defendant say the men who hurt Demarkas did not know who they were dealing with and he was not going to allow his family to be disrespected.

The evidence disclosed Demarkas's stepbrother-in-law, T.O., saw defendant with a black semiautomatic handgun in August 2003. T.O. told Demarkas's wife and the investigating detective that, about a week before the shooting, defendant purchased the black nine-millimeter handgun from some people standing at a local market. Before the shooting, T.O. saw defendant show the gun to Demarkas and say, "This is a nice gun," or something to that effect. Demarkas's wife reported that defendant said he bought the gun on the street for $20. She also told an investigator that defendant told her that he gave the gun to Demarkas.

Defendant and Demarkas's wife testified that M.W. came to the door of Demarkas's apartment the evening of the shooting and tried to kick it in while Demarkas was at work. As soon as his wife called him, Demarkas started to walk home. Defendant picked Demarkas up on the way and brought Demarkas to Demarkas's apartment.

At 10:21 p.m., Demarkas called 911. In that call, he reported his wife told him someone was trying to kick in his back door. Demarkas told the operator the person was driving a primer gray Nova or a white Chevy.

Sacramento County Sheriffs responded to the apartment. The lead responding deputy did not remember seeing any damage to the door when he arrived and did not

4

prepare a report. He cleared the call at 11:00 p.m. Demarkas was upset because the deputies would not do anything.

Demarkas testified he got his gun from under the pillow on his bed. Next, defendant, Demarkas, and his wife left Demarkas's apartment and drove to defendant's apartment complex. On the way, Demarkas saw M.W.'s car in the parking lot of the fast-food restaurant. After they parked at defendant's apartment, Demarkas testified he took his gun from the car.

B.P. was present at McClish's apartment complex the night of the shooting. Around 9:30 or 10:00 p.m. that night, McClish told B.P. that Demarkas was coming over. Around 11:00 p.m., Demarkas arrived and asked B.P. where McClish was. B.P. responded he was asleep in their apartment and Demarkas went upstairs.

A little later, B.P. saw defendant, Demarkas, and McClish together. Demarkas told defendant, "There they go," "There go the car," "The ones that jumped me," and "[W]e need to go." B.P. saw the three men leave through the front of the apartment complex.

After he was arrested, Demarkas told the investigating detective his nine-millimeter handgun was at his dad's house. He said he walked over to the fast-food restaurant and shot into the gray Nova. He described himself as angry and fed up. Demarkas told the detective, "Man, when I seen him, I just clicked. You know what I'm saying? I was fed up with this mother fucker, and I seen him at the drive-thru [restaurant]. I walked up there, and I saw him, and I just shot. I didn't even look. I just shot in the fucking car." Demarkas said he saw M.W. in the passenger seat of the car but did not know who was driving. He said he was trying to shoot Nova Mike. He also told the detective that defendant was watching the shooting from the other side of the nearby cinderblock wall. After the shooting, Demarkas told the officer his father asked for the gun and Demarkas gave it to him.

5

The independent witnesses' testimony and evidence were consistent with the version of events Demarkas relayed to the detective. Witnesses at the fast-food restaurant saw Demarkas walk up to the passenger side of a primer gray car, pull out a gun, and fire into the car several times. In a subsequent inspection of the crime scene, police found six nine-millimeter shell casings on the ground. All of the casings were fired from the same gun.

The witnesses also saw another man standing near Demarkas in the drive-through area at the time of the shooting (presumably McClish). After the first shot, the witness said Demarkas looked back at the second man and then fired additional shots. After the shooting, witnesses saw Demarkas and the second man jump over the cinderblock wall and leave. Both men had guns in their hands.

B.P. heard the shots coming from the fast-food restaurant and then heard footsteps coming through the field. Next, she saw defendant, Demarkas, and McClish jump over the fence into the apartment complex. B.P. saw defendant take a handgun out of his waistband and unload it. He told B.P., "we do this gangsta style." Defendant put the gun in his waistband and left in the direction of his apartment.

A second witness also saw defendant, Demarkas, and McClish return through the field after the gunshots and jump over the fence about five minutes after the shooting. That witness testified defendant was yelling, "[T]hey should not mess with my family." This witness saw defendant reload the gun he was holding when he returned.

Demarkas's wife testified Demarkas said defendant had told Demarkas the night of the murder words to the effect of, "[Y]ou need to do what you got to do."

When he was arrested, defendant first told the detective that he saw Demarkas run by himself over to the fast-food restaurant, heard some gunshots, and then saw Demarkas run back to the apartment complex. Defendant claimed he only walked across the field to see, but turned back to the apartment when he heard the gunshots. Later, defendant admitted he got up to the wall but could not climb over it. So, he pulled himself up to

6

look, and that is when he heard (but did not see) Demarkas fire the shots and saw Demarkas's arm extended towards the car. Defendant and the detective went to the scene, and defendant pointed out where he had stood on a water pipe next to the wall when the shooting occurred.

During a later statement, defendant told the detective Demarkas had a gun and tried to hand it to him, but defendant did not want it, so he let it drop to the ground and left it there.

The car containing the two men Demarkas shot drove into a gas station across the street. Qualls got out of the car and fell down, while M.W. walked around. Qualls died from the gunshot wounds after being taken to the hospital.

In the days following the shooting, defendant talked about people "[m]essing with his 'M' F'ing children," and disrespecting his family and how he was not going to allow that. Defendant also told Demarkas's wife defendant had gotten rid of the gun.

After the shooting, Demarkas spoke with his wife about the shooting. In that conversation, Demarkas told her McClish and defendant accompanied him to the fast-food restaurant the night of the shooting. Demarkas said defendant could not hop the wall but got up into a position where he could see what happened. Demarkas said the plan was not to "go over there and pop these [N-words]." Demarkas also said that, on the night of the shooting, defendant told him, "You got to do what you got to do." Demarkas told his wife that he and McClish were armed with guns at the shooting, and that Demarkas was the one who pulled the trigger.

The jury found defendant, Demarkas, and McClish not guilty of first degree murder, but found them guilty of second degree murder of Qualls and the attempted murder of M.W. In his direct appeal, this court affirmed defendant's convictions. (*King I, supra*, C050300.)

7

B.      *Defendant's Section 1172.6 Petition*

In January 2019, defendant filed a petition under section 1172.6 to be resentenced on his murder conviction. The petition only raised the issue of his murder conviction.[6] In its preliminary order, the trial court noted it appeared the original petition challenged the murder conviction, but acknowledged it was possible defendant sought relief from his attempted murder conviction based on an equal protection theory. In his brief, defendant indeed argued Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) covered attempted murder convictions.

The trial court denied the petition at the prima facie stage as to both the murder count and the attempted murder count. In June 2021, we reversed and remanded the matter for an order to show cause/evidentiary hearing. (*King II, supra,* C091351.)

On remand, in October 2021, the trial court set the matter for an evidentiary hearing in January 2022 recognizing Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill No. 775) would be in effect at that time. In January and June 2022, the People submitted briefing that argued defendant was still guilty of murder and attempted murder despite the change in the law. In response, defendant argues he was no longer guilty of murder, but should be resentenced on the attempted murder conviction. Notably, he did not argue the application of Senate Bill No. 775 to his attempted murder conviction.

The parties submitted the matter on the original trial reporter's transcript, the clerk's transcript, and briefing. The trial court also admitted a copy of our original opinion in *King I* and used it solely to relate the procedural history of the case. The trial court found there was proof beyond a reasonable doubt that defendant was guilty of the murder of Qualls. The trial court concluded the evidence demonstrated defendant planned with Demarkas to kill M.W. and another person in retaliation for M.W. beating

---

[6]      On our own motion, we augmented the record in this case to incorporate by reference the record in defendant's prior appeal. (*People v. King* (June 28, 2021, C091351) [nonpub. opn.] (*King II*); Cal. Rules of Court, rule 8.155.)

8

up Demarkas in his apartment. Defendant made statements that indicated an intent to kill and aid in the shooting of others, including the statements "they" did not know who "they" were messing with and that his family was not to be disrespected. Further, the trial court found the evidence demonstrated defendant gave Demarkas the gun when Demarkas reported that M.W. was in the drive-through of the neighboring fast-food restaurant, and defendant went to watch the shooting. The court further stated that if these facts did not establish express malice, they established implied malice in that defendant demonstrated a reckless disregard for human life.

Defendant filed a timely notice of appeal.

II

DISCUSSION

Defendant argues the evidence was insufficient to find beyond a reasonable doubt that he could be convicted of murder under the current law because the record lacked substantial evidence he engaged in the requisite actus reus or had the mens rea to establish he aided and abetted a murder with implied malice. He further argues the trial court could not conclude defendant acted with express malice because the jury acquitted him of first degree murder. He asks us to reverse his conviction for attempted murder or remand the case for further proceedings on that count.

A.    *Senate Bills No. 1437 and No. 775*

Senate Bill No. 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill No. 1437 achieved this by amending sections 188 and 189. (Stats. 2018, ch. 1015, §§ 2, 3.) Effective January 1, 2022, Senate Bill No. 775 amended section 1172.6 to expand its coverage to include those convicted of "attempted murder under the natural and probable

9

consequences doctrine . . . .” (Stats. 2021, ch. 551, § 2; § 1172.6, subd. (a).) Section 1172.6 permits persons who were previously convicted of murder under the natural and probable consequence doctrine to petition for resentencing if they “could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 effective January 1, 2019.” (§ 1172.6, subd. (a)(3).)

In relevant part, Senate Bill No. 1437 “amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that ‘[m]alice shall not be imputed to a person based solely on his or her participation in a crime.’ (§ 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.)” (*People v. Harden* (2022) 81 Cal.App.5th 45, 51; see *People v. Strong* (2022) 13 Cal.5th 698, 707-708.) This language eliminated the use of the natural and probable consequences doctrine in murder prosecutions but left “personally possessing malice aforethought a necessary element of murder.” (*People v. Gentile* (2020) 10 Cal.5th 830, 846.)

Implied malice murder also remains as a valid legal theory for a second degree murder conviction after the changes to sections 188 and 189. (*People v. Powell* (2021) 63 Cal.App.5th 689, 714.) “Murder is committed with implied malice when ‘the killing is proximately caused by “ ‘an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.’ ” ’ ” (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Under this theory, “ ‘an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.’ ” (*Id.* at p. 990.)

In addition, “ ‘[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor’s own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts

10

constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' " (*People v. Reyes, supra*, 14 Cal.5th at pp. 990-991, italics omitted.)  As explained in *Reyes,* it is not enough to simply travel with the armed murderer into gang territory.  (*Id.* at pp. 991-992.)  Instead, where the life-endangering act is a shooting, the trial court must ask whether the aider and abettor knew that the direct perpetrator intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life. (*Id.* at p. 992.)

B.      *Procedure and Standard of Review*

After the trial court issues an order to show cause, "the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence."  (§ 1172.6, subd. (d)(1).)  At the hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019."  (*Id*., subd. (d)(3).)

We review a trial court's findings following an evidentiary hearing on a section 1172.6 petition for substantial evidence.  (*People v. Clements, supra*, 75 Cal.App.5th at p. 298.)  "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."

11

(*Ibid.*)  This standard of review does not change because the trial reviewed a section 1172.6 petition on a paper record.  (*Clements,* at p. 301.)  " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

        C.     *Application to Defendant's Murder Conviction*

As guided by *Reyes,* the key question here is whether substantial evidence exists that defendant (1) knew that Demarkas intended to shoot at the victims, (2) intended to aid him in the shooting, (3) knew that shooting was dangerous to life, and (4) acted in conscious disregard for life.  We conclude that substantial evidence supports these elements.

When he learned that his son Demarkas had been beaten by the victims in his apartment, defendant expressed his outrage and stated he would not allow his family to be treated in this manner.  Defendant encouraged Demarkas and McClish to get a second gun.  In fact, defendant showed Demarkas the small, black nine-millimeter gun he had just purchased at the local market.  Defendant admitted he supplied Demarkas with the weapon Demarkas used during the shooting.

After the victims came to Demarkas's apartment door the night of the murder, defendant went with Demarkas to defendant's apartment complex.  On the way, Demarkas saw M.W.'s car in the parking lot of the nearby fast-food restaurant.  When they arrived at defendant's and McClish's apartment complex, Demarkas told defendant, "There they go," "There go the car," "The ones that jumped me," and "[W]e need to go." Defendant accompanied Demarkas and McClish as they left the apartment complex to commit their crimes.

At the time the men went to the confrontation, defendant told Demarkas he "got to do what [he] got to do."  Defendant had to know Demarkas was in an agitated state and had the gun that defendant had given him.  Defendant accompanied Demarkas and

12

McClish to the fast-food restaurant and stood close by while Demarkas fired repeatedly into the car, killing one of the victims and injuring the other.

The three men returned from the murder together, and defendant had the murder weapon in his possession. Defendant proudly proclaimed his participation in the crime when he told B.P., "we do this gangsta style," and "[t]hey should not mess with my family."

Defendant's knowledge that Demarkas would go to the car and shoot the people inside it is supported by the evidence of: (1) defendant's outrage at M.W.'s treatment of his family, displayed both before and after the crime, (2) his direction that Demarkas and McClish should get another gun, (3) obtaining the gun used in the crime and supplying it to Demarkas, (4) accompanying Demarkas to the scene of the shooting after telling him to do what he had to do, knowing it was the men who had intimidated his family, and (5) his presence at the scene of the shooting.

The trial court reasonably inferred from these actions that defendant knew Demarkas would go to the car and shoot into it, and defendant intended to aid Demarkas in that shooting. Defendant had to know shooting into an occupied vehicle with a semiautomatic pistol is dangerous to human life, and defendant acted in conscious disregard of life when he gave this life-threatening instrumentality to Demarkas, encouraged him to use it, and encouraged the murder and attempted murder by being physically present as it unfolded before his eyes, doing nothing to stop it. Contrary to his argument, defendant was not merely a person who expressed some support for the shooting. Defendant was involved in every step of the crime.

D. *First Degree Murder Acquittal*

Defendant argues reversal is required because the jury acquitted him of premeditated murder and thus the trial court could not find he had express malice to uphold his second degree murder conviction. Because we conclude substantial evidence supports the trial court's finding defendant acted with *implied* malice and defendant does

13

not argue the first degree murder acquittal bars this theory, we need not reach this argument.

E.     *Attempted Murder Conviction*

Defendant argues we should reverse his attempted murder conviction or remand it for further proceedings under section 1172.6. Defendant forfeited this contention by not raising it in the trial court.

As it relates to the crime of attempted murder, in 2021 the Legislature amended section 1172.6 with Senate Bill No. 775. (Stats. 2021, ch. 551.) That statute became effective January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865.) As amended, section 1172.6, subdivision (a) states: "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." This change to section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.)

Defendant's original petition did not raise the issue of resentencing for his attempted murder conviction. After this court remanded the matter, not only did defendant fail to argue the trial court should vacate the attempted murder conviction, he also affirmatively argued the trial court should strike his murder conviction under section 1172.6 and just *resentence* him on the attempted murder conviction. Defendant therefore forfeited his argument that we should remand this case for further consideration of his attempted murder conviction. (*People v. Scott* (1994) 9 Cal.4th 331, 351-354 [to preserve the issue for appellate review, the defendant must raise it in the trial court].)

14

DISPOSITION

The judgment is affirmed.

_____\s\_____,
Krause, J.

We concur:

_____\s\_____,
Robie, Acting P. J.

_____\s\_____,
Wiseman, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15